# DENNIS ET AL. v. UNITED STATES.

No. 502. Argued April 20, 1966.—Decided June 20, 1966.

*Telford Taylor* argued the cause for petitioners. With him on the briefs were *Nathan Witt* and *George J. Francis.*

*Nathan Lewin* argued the cause for the United States. With him on the brief were *Solicitor General Marshall,*

*Assistant Attorney General Yeagley, Kevin T. Maroney, George B. Searls* and *Sidney M. Glazer.*

*Gerhard P. Van Arkel, Charles F. Brannan, John F. O'Donnell, Joseph L. Rauh, Jr., Eugene Cotton, Melvin L. Wulf, Jacob Sheinkman, Joseph M. Jacobs* and *John Ligtenberg* filed a brief for the American Civil Liberties Union et al., as *amici curiae,* urging reversal.

MR. JUSTICE FORTAS delivered the opinion of the Court.

The six petitioners and eight others were indicted in the United States District Court for the District of Colorado on a charge of violating the general conspiracy statute, 18 U. S. C. § 371 (1964 ed.).[1] The single-count indictment alleged a conspiracy fraudulently to obtain the services of the National Labor Relations Board on behalf of the International Union of Mine, Mill and Smelter Workers, by filing false affidavits in purported satisfaction of the requirements of § 9 (h) of the National Labor Relations Act, as amended by the Taft-Hartley Act, 61 Stat. 146.

Section 9 (h), which was later repealed,[2] provided that labor unions could not secure Labor Board investigation of employee representation or the issuance of a complaint unless there was on file with the Board so-called

---

[1] The statute reads: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both. . . ."

[2] Congress substituted for § 9 (h), legislation making it a crime for a Communist Party member to hold office or any other substantial position of employment in any labor union. 73 Stat. 536, 29 U. S. C. § 504 (1964 ed.). See note 9, *infra.* In *United States* v. *Brown,* 381 U. S. 437, this successor statute was held unconstitutional as a bill of attainder.

non-Communist affidavits of each officer of the union and its parent organization. The statute required that these affidavits attest that the officer is not a member of the Communist Party or "affiliated with such party, and that he does not believe in, and is not a member of or supports any organization that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional methods."

Four of the six petitioners—Dennis, Dichter, Travis and Wilson—were officers of the union. Each is alleged to have filed false non-Communist affidavits. Petitioners Sanderson and Skinner were, at relevant times, union members but not officers. They are charged with participation in the conspiracy. All were alleged to be "members of and affiliated with the Communist Party."

The indictment was returned in 1956. At the first trial, petitioners and others were convicted. On appeal, the Court of Appeals for the Tenth Circuit sustained the validity of the indictment, but reversed the judgments on the ground that prejudicial hearsay evidence had been admitted in evidence. 302 F. 2d 5.

On retrial, the petitioners were again convicted and each was sentenced to three years' imprisonment and fined $2,000. This time, the Court of Appeals affirmed. 346 F. 2d 10. We granted certiorari (382 U. S. 915) limited to three questions:

"1. Whether the indictment states the offense of conspiracy to defraud the United States;

"2. Whether, in the comparative light of *American Communications Assn.* v. *Douds,* 339 U. S. 382, and *United States* v. *Archie Brown,* 381 U. S. 437, Section 9 (h) of the Taft-Hartley Act is constitutional;

"3. Whether the trial court erred in denying petitioners' motions for the production, to the defense or the Court, of grand jury testimony of prosecution witnesses."

Essentially, the Government's case is that, prior to June 1949, the union and the Communist Party opposed compliance with § 9 (h); that in 1949 the Communist Party and the union, as a consequence of discussions participated in by petitioners and others, determined that preservation of the Party's allegedly dominating position in the union, and the union's welfare itself, required that the union officials take steps to secure the Board's services for the union; and that, in order to accomplish this purpose, the union's officers were nominally to resign from the Communist Party and to file the non-Communist affidavits required by § 9 (h). Pursuant to this plan, it is alleged, the union leadership voted to comply with § 9 (h). Those officers who were Party members, including four of the petitioners herein, purported to resign from the Party.[3] They then proceeded, at various dates between August 1949 and February 1955, to file with the Labor Board the required non-Communist affidavits. This action, it is contended, was cynical and fraudulent, and petitioners' affidavits were false. In reality, it is claimed, petitioners' Communist Party affiliations remained unaffected as did the Party's domination of the union's affairs. The union thereafter proceeded, on several occasions, to utilize the Board's services, a privilege which it had obtained as a result of these assertedly fraudulent acts.

## I.

We first discuss the question, considered both in the District Court and in the Court of Appeals,[4] whether the

---

[3] One of the petitioners, Travis, made a public announcement of his resignation. The other officers of the union sent purported letters of resignation from the Party to local Party offices.

[4] The opinion of the District Court sustaining the indictment is reported in *United States* v. *Pezzati*, 160 F. Supp. 787 (D. C. D. Colo. 1958). On this issue, the Court of Appeals affirmed. *United States* v. *Dennis*, 302 F. 2d 5 (C. A. 10th Cir. 1962).

indictment properly charged a conspiracy to defraud the United States under 18 U. S. C. § 371. We agree that indictments under the broad language of the general conspiracy statute must be scrutinized carefully as to each of the charged defendants because of the possibility, inherent in a criminal conspiracy charge, that its wide net may ensnare the innocent as well as the culpable. See *Krulewitch* v. *United States,* 336 U. S. 440, 445–458 (concurring opinion); *United States* v. *Bufalino,* 285 F. 2d 408, 417–418 (C. A. 2d Cir. 1960). But in the present case we conclude that the indictment for conspiracy was proper as to each of the petitioners.

Four of the petitioners—those who filed the affidavits alleged to be false—presumably could have been indicted for the substantive offense of making false statements as to a "matter within the jurisdiction of" the Board, a violation of 18 U. S. C. § 1001 (1964 ed.). But the essence of their alleged conduct was not merely the individual filing of false affidavits. It was also the alleged concert of action—the common decision and common activity for a common purpose. The conspiracy was not peripheral or incidental. It lay at the core of the alleged offense. It is the entire conspiracy, and not merely the filing of false affidavits, which is the gravamen of the charge. This conspiratorial program included, as prime factors, not only those who themselves filed the false statements, but others who were equally interested in the conspiratorial purpose and who were directly and culpably involved in the alleged scheme. The Government sought to fasten culpability upon all of the conspirators. The indictment properly charges a conspiracy, and with the required specificity alleges the culpable role of each of the petitioners.

Nor can it be concluded that a conspiracy of the described nature and objective is outside the condemnation of the specific clause of § 371 relied upon in the

indictment, which charges a conspiracy "to defraud the United States, or any agency thereof in any manner or for any purpose." It has long been established that this statutory language is not confined to fraud as that term has been defined in the common law. It reaches "any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government," *Haas* v. *Henkel,* 216 U. S. 462, 479, quoted in *United States* v. *Johnson,* 383 U. S. 169, 172.[5] See also, *Lutwak* v. *United States,* 344 U. S. 604; *Glasser* v. *United States,* 315 U. S. 60, 66; *Hammerschmidt* v. *United States,* 265 U. S. 182, 188. Cf. Goldstein, Conspiracy to Defraud the United States, 68 Yale L. J. 405, 414–441, 455–458 (1959). In the present case, it is alleged that petitioners, unable to secure for their union the benefit of Labor Board process except by submitting non-Communist affidavits, coldly and deliberately concocted a fraudulent scheme; and in furtherance of that scheme, some of the petitioners did in fact submit false affidavits and the union did thereafter use the Labor Board facilities made available to them. This Court's decisions foreclose the argument that these allegations do not properly charge a conspiracy to defraud the United States.

Petitioners argue, however, that their conduct cannot be considered as fraudulent for purposes of § 371 because the Labor Board is required to certify the compliance of any union whose officers have filed non-Communist affidavits—without regard to the veracity thereof. *Leedom* v. *International Union,* 352 U. S. 145, and *Meat Cutters* v. *Labor Board,* 352 U. S. 153. The claim is that since the Board's action in making its services available to the

---

[5] In *Johnson,* the allegation that the defendants had conspired to defraud the United States was upheld although they were not charged with "any false statement, misrepresentation or deceit." See *United States* v. *Johnson,* 337 F. 2d 180, 185–186 (C. A. 4th Cir. 1964), aff'd as to that issue, 383 U. S. 169, 172.

union was not and could not lawfully have been predicated upon the truthfulness of the affidavits, the element of reliance is missing and there is no conspiracy to defraud. It is true that Congress, in order to free the Board of the delays that would be attendant upon testing the bona fides of controverted affidavits,[6] did relegate to the criminal law the responsibility for dealing with false filings. This allocation of responsibility relating to the sanctions attached to false affidavits does not alter the character or legal consequences of petitioners' alleged actions. It is beyond argument that Congress unmistakably regarded the filing of truthful affidavits—and not merely affidavits true or false—as of the essence of the privilege of using Board facilities. Congress made this doubly clear by expressly providing that certain criminal statutes, such as 18 U. S. C. § 1001 relating to the filing of false statements, shall be applicable in respect of § 9 (h) affidavits.

The facts are, according to the indictment, that petitioners and their co-conspirators could not have obtained the Board's services and facilities without filing non-Communist affidavits; that the affidavits were submitted as part of a scheme to induce the Board to act; that the Board acted in reliance upon the fact that affidavits were filed; and that these affidavits were false. Within the meaning of § 371, this was a conspiracy to defraud the United States or an agency thereof.

Still another argument is advanced to defeat the indictment. Petitioners submit that this case does not involve a conspiracy to defraud, but rather, under the alternative clause of § 371, a conspiracy to commit the substantive offense of filing false statements in violation of 18 U. S. C. § 1001. It is their contention that *Bridges* v. *United States,* 346 U. S. 209, compels the conclusion

---

[6] See the legislative materials set out in *Leedom* v̆. *International Union,* 352 U. S., at 149–150.

that a conspiracy to file false statements may not properly be laid under the conspiracy-to-defraud clause of § 371. *Bridges* is not in point. The decision there did not turn upon construction of § 371. The question before the Court was whether a prosecution, otherwise time-barred, could be revived by reference to the Wartime Suspension of Limitations Act, 18 U. S. C. § 3287 (1964 ed.). The Suspension Act applies to "any offense . . . involving fraud or attempted fraud against the United States or any agency thereof . . . ." The indictment in *Bridges* charged both the filing of false statements and a conspiracy to defraud, in order to obtain a certificate of naturalization.[7] The Court held that the Suspension Act did not apply to these offenses. The Act, the Court ruled, was to be construed narrowly and to be applied "only where the fraud is of a pecuniary nature or at least of a nature concerning property." 346 U. S., at 215. The Court characterized the charge that Bridges and his collaborators had conspired to defraud the United States as a "cloak," the sole purpose of which was to revive a stale prosecution.

In the present case, on the other hand, the allegation as to conspiracy to defraud, as we have discussed, properly reflects the essence of the alleged offense. It does not involve an attempt by prosecutorial sleight of hand to overcome a time bar.[8] The fact that the events in-

---

[7] The indictment in *Bridges* was in three counts. Two charged substantive violations of false statement provisions of the Nationality Act of 1940, formerly 8 U. S. C. §§ 746 (a) (1) and 746 (a) (5) (1940 ed.), now 18 U. S. C. §§ 1015 and 1425 (1964 ed.). The third count alleged a conspiracy to defraud the United States or an agency thereof, in violation of 18 U. S. C. § 371.

[8] Petitioners suggest that in this case, too, the Government resorted to the conspiracy-to-defraud clause of § 371 in order to avoid a time bar. The claim is that this was necessary to bring the 1949 filings (defendant Van Camp, acquitted at trial, made no filings after 1949) within the applicable statute of limitations. But the events of 1949 are properly within the time span of the indictment

clude the filing of false statements does not, in and of itself, make the conspiracy-to-defraud clause of § 371 unavailable to the prosecution. Cf. *Glasser* v. *United States,* 315 U. S. 60, 66–67; *United States* v. *Manton,* 107 F. 2d 834, 839 (C. A. 2d Cir. 1939), cert. denied, 309 U. S. 664.

We conclude, therefore, that the indictment properly charged a violation of the conspiracy-to-defraud clause of § 371.

## II.

Petitioners next urge that we set aside their convictions on the ground that § 9 (h) of the Taft-Hartley Act is unconstitutional. In particular, they rely upon *United States* v. *Brown,* 381 U. S. 437, in which the Court held unconstitutional as a bill of attainder the statute enacted by Congress in 1959 to replace § 9 (h). The new statute made it a crime for a member of the Communist Party to hold office or any other substantial employment in a labor union.[9] They contend that *Brown* in effect over-

---

and provable at trial, not because it charges a conspiracy to defraud, but because it charges a conspiracy, and because at least one overt act is alleged to fall within the applicable period. See *Grunewald* v. *United States,* 353 U. S. 391, 396–397; *Fiswick* v. *United States,* 329 U. S. 211, 216; *Brown* v. *Elliott,* 225 U. S. 392, 400–401. Had the indictment charged a conspiracy to violate § 1001—which charge would be unaffected by *Bridges*—the same result would obtain; that is, the Government was enabled to reach back to 1949 by reason of the conspiracy charge. Whether it charged a conspiracy to commit an offense or one to defraud is immaterial for this purpose. Unlike the situation in *Bridges,* the Government here secured no advantage with respect to limitations by charging under one clause of § 371 rather than the other.

[9] The statute, 73 Stat. 536, 29 U. S. C. § 504 (1964 ed.), provides: "(a) No person who is or has been a member of the Communist Party . . . shall serve—

"(1) as an officer, director, trustee, member of any executive board or similar governing body, business agent, manager, organizer, or other employee (other than as an employee performing exclu-

ruled *American Communications Assn.* v. *Douds,* 339
U. S. 382, which sustained the validity of § 9 (h), and
they ask that we now reconsider *Douds.*[10]

We need not reach this question, for petitioners are in
no position to attack the constitutionality of § 9 (h).
They were indicted for an alleged conspiracy, cynical and
fraudulent, to circumvent the statute.  Whatever might
be the result where the constitutionality of a statute is
challenged by those who of necessity violate its provi-
sions and seek relief in the courts is not relevant here.
This is not such a case.  The indictment here alleges an
effort to circumvent the law and not to challenge it—a
purported compliance with the statute designed to avoid
the courts, not to invoke their jurisdiction.[11]

---

sively clerical or custodial duties) of any labor organization . . .
during or for five years after the termination of his membership in
the Communist Party . . . .

"(b) Any person who willfully violates this section shall be fined
not more than $10,000 or imprisoned for not more than one year,
or both."

[10] Petitioners also rely upon *Aptheker* v. *Secretary of State,* 378
U. S. 500, where the Court invalidated a statute denying passports
to members of any Communist organization.

[11] We note that petitioners are alleged to have entered upon the
conspiracy and to have filed the first set of false affidavits during
the pendency in this Court of a case raising precisely the constitu-
tional issue now raised by them.  Probable jurisdiction was noted in
*Douds* on November 8, 1948, and certiorari was granted in the com-
panion case, *United Steelworkers* v. *Labor Board,* 335 U. S. 910, on
January 17, 1949.  Petitioners are charged with commencing to con-
spire in June 1949 and with filing false affidavits in August 1949.
Despite this Court's decision in *Douds,* announced on May 8, 1950
(339 U. S. 382), sustaining the validity of § 9 (h), the indictment
charges that petitioner Dennis and one Van Camp signed a Board
election agreement less than two weeks later, and in December 1950
new affidavits were filed.  In short, petitioners chose not only to
evade the statute, but to ignore judicial proceedings likely to clarify
their rights and then to flout an adverse decision of this Court.  In
this context, any claim that it is too burdensome to test these
statutes in the courts is not entitled to consideration.

It is no defense to a charge based upon this sort of enterprise that the statutory scheme sought to be evaded is somehow defective. Ample opportunities exist in this country to seek and obtain judicial protection.[12] There is no reason for this Court to consider the constitutionality of a statute at the behest of petitioners who have been indicted for conspiracy by means of falsehood and deceit to circumvent the law which they now seek to challenge. This is the teaching of the cases.

In *Kay* v. *United States,* 303 U. S. 1, this Court upheld a conviction for making false statements in connection with the Home Owners' Loan Act of 1933, without passing upon the claim that the Act was invalid. The Court said, "When one undertakes to cheat the Government or to mislead its officers, or those acting under its authority, by false statements, he has no standing to assert that the operations of the Government in which the effort to cheat or mislead is made are without constitutional sanction." 303 U. S., at 6. See also *United States* v. *Kapp,* 302 U. S. 214, involving a false claim for money under the subsequently invalidated Agricultural Adjustment Act of 1933. Analogous are those cases in which prosecutions for perjury have been permitted despite the fact that the trial at which the false testimony was elicited was upon an indictment stating no federal offense (*United States* v. *Williams,* 341 U. S. 58, 65–69); that the testimony was before a grand jury alleged to have been tainted by governmental misconduct (*United States* v. *Remington,* 208 F. 2d 567, 569 (C. A. 2d Cir. 1953), cert. denied, 347 U. S. 913); or that the defendant testified without having been advised of his constitutional rights (*United States* v. *Winter,* 348 F. 2d 204, 208–210 (C. A. 2d Cir. 1965), cert. denied, 382 U. S. 955, and cases cited therein).

---

[12] Indeed, petitioners' own union successfully prevented the National Labor Relations Board from withholding benefits on the basis of petitioner Travis' allegedly false § 9 (h) affidavit. *Leedom* v. *International Union,* 352 U. S. 145.

Petitioners seek to distinguish these cases on the ground that in the present case the constitutional challenge is to the propriety of the very question—Communist Party membership and affiliation—which petitioners are accused of answering falsely. We regard this distinction as without force. The governing principle is that a claim of unconstitutionality will not be heard to excuse a voluntary, deliberate and calculated course of fraud and deceit. One who elects such a course as a means of self-help may not escape the consequences by urging that his conduct be excused because the statute which he sought to evade is unconstitutional. This is a prosecution directed at petitioners' fraud. It is not an action to enforce the statute claimed to be unconstitutional.

It is argued in dissent, see pp. 876–880, *post*, that we cannot avoid passing upon petitioners' constitutional claim because it bears upon whether they may be charged with defrauding the Government of a "lawful function." At the time of some of the allegedly fraudulent acts of the conspirators, this Court's decision in *Douds* had been handed down. It was flouted, not overlooked. This position loses sight of the distinction between appropriate and inappropriate ways to challenge acts of government thought to be unconstitutional. Moreover, this view assumes that for purposes of § 371, a governmental function may be said to be "unlawful" even though it is required by statute and carries the fresh imprimatur of this Court. Such a function is not immune to judicial challenge. But, in circumstances like those before us, it may not be circumvented by a course of fraud and falsehood, with the constitutional attack being held for use only if the conspirators are discovered.

Because the claimed invalidity of § 9 (h) would be no defense to the crime of conspiracy charged in this indictment, we find it unnecessary to reconsider *Douds*.

## III.

We turn now to petitioners' contention that the trial court committed reversible error by denying their motion to require production for petitioners' examination of the grand jury testimony of four government witnesses.[13] Alternatively, petitioners sought *in camera* inspection by the trial judge to be followed by production to petitioners in the event the judge found inconsistencies between trial testimony and that before the grand jury.

The trial judge denied the motions, made at the conclusion of the direct examination of each of the witnesses, on the ground that no "particularized need" had been shown. See *Pittsburgh Plate Glass Co.* v. *United States,* 360 U. S. 395, 400. On appeal, the Court of Appeals held that the denial of the motions was not reversible error. The court recognized "the inherent power and the inescapable duty of the trial court to lift the lid of secrecy on grand jury proceedings in aid of the search for truth," and that its obligation was "not [to] hesitate to inspect and to disclose any inconsistencies if it is likely to aid the fair administration of criminal justice through proper cross-examination and impeachment." 346 F. 2d, at 17. It went so far as to express the view that "it would have been safer to have inspected the grand jury testimony." *Id.,* at 18. But because "the witnesses were

---

[13] Three of the witnesses in question testified at the second trial. A fourth, Mason, died in the interval between the two trials. At the first trial, the petitioners had moved for production or *in camera* inspection of his grand jury testimony. This was denied. At the second trial, they objected to use of his testimony at the first trial on the ground that they had not been permitted to examine, or to have the trial judge examine, the transcript of his grand jury testimony. Since the omission to require production of Mason's grand jury testimony with a view to impeachment can no longer be remedied, his trial testimony, under our holding herein, is no longer available to the Government in the event petitioners are retried.

thoroughly and competently cross-examined on numerous other relevant judicial and extra-judicial statements without manifest inconsistency," the court thought it "safe to assume that the grand jury proceedings would not have disclosed anything of impeaching significance." *Ibid.*

In his brief in this Court, the Solicitor General concedes that "there is substantial force to petitioners' claims that the interest in secrecy was minimal in light of the oft-repeated testimony of the witnesses and that the arguments they now advance, if made at trial, might have suggested *in camera* inspection as an appropriate course." Brief for the United States, p. 51. But the Government argues that it was not error for the trial judge to have denied petitioners' motions. With this latter proposition we disagree, and we reverse.

This Court has recognized the "long-established policy that maintains the secrecy of the grand jury proceedings in the federal courts." *United States* v. *Procter & Gamble Co.,* 356 U. S. 677, 681. And it has ruled that, when disclosure is permitted, it is to be done "discretely and limitedly." *Id.,* at 683. Accordingly, the Court has refused in a civil case to permit pretrial disclosure of an entire grand jury transcript where the sole basis for discovery was that the transcript had been available to the Government in preparation of its case. *Procter & Gamble, supra.* And, in *Pittsburgh Plate Glass Co.* v. *United States, supra,* the Court sustained a trial court's refusal to order disclosure of a witness' grand jury testimony where the defense made no showing of need, but insisted upon production of the minutes as a matter of right, and where there was "overwhelming" proof of the offense charged without reference to the witness' trial testimony.

In general, however, the Court has confirmed the trial court's power under Rule 6 (e) of the Federal Rules of

Criminal Procedure to direct disclosure of grand jury testimony "preliminarily to or in connection with a judicial proceeding." In *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 234, the Court acknowledged that "after the grand jury's functions are ended, disclosure is wholly proper where the ends of justice require it." In *Procter & Gamble, supra,* the Court stated that "problems concerning the use of the grand jury transcript at the trial to impeach a witness, to refresh his recollection, to test his credibility . . ." are "cases of particularized need where the secrecy of the proceedings is lifted discretely and limitedly." 356 U. S., at 683. And in *Pittsburgh Plate Glass, supra,* where four members of the Court concluded that even on the special facts of that case the witness' grand jury testimony should have been supplied to the defense, the entire Court was agreed that upon a showing of "particularized need" defense counsel might have access to relevant portions of the grand jury testimony of a trial witness, 360 U. S., at 400, 405.[14] In a variety of circumstances, the lower federal courts, too, have made grand jury testimony available to defendants.[15]

These developments are entirely consonant with the growing realization that disclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice. This realization is reflected in the enactment of the so-called Jencks Act,

---

[14] Because there had been no request for *in camera* judicial inspection of the grand jury minutes, the Court in *Pittsburgh Plate Glass* did not pass upon the adequacy of that technique for protecting a defendant's interests. 360 U. S., at 401.

[15] See, *e. g., United States* v. *Remington,* 191 F. 2d 246, 250–251 (C. A. 2d Cir. 1951), cert. denied, 343 U. S. 907 (defendant charged with commission of perjury before the grand jury); *Atlantic City Electric Co.* v. *A. B. Chance Co.,* 313 F. 2d 431 (C. A. 2d Cir. 1963) (use by private plaintiff in antitrust suit of witness' grand jury testimony); and cases cited in note 21, *infra.*

18 U. S. C. § 3500 (1964 ed.), responding to this Court's decision in *Jencks* v. *United States,* 353 U. S. 657, which makes available to the defense a trial witness' pretrial statements insofar as they relate to his trial testimony.[16] It is also reflected in the expanding body of materials, judicial and otherwise, favoring disclosure in criminal cases analogous to the civil practice.[17]

Certainly in the context of the present case, where the Government concedes that the importance of preserving

---

[16] 18 U. S. C. § 3500 (b) (1964 ed.) reads in part: "After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. . . ." Subsection (e) defines "statement" for purposes of the Act.

[17] See, *e. g.,* the Amendments to Rule 16 of the Federal Rules of Criminal Procedure, approved by this Court on February 28, 1966, and transmitted to Congress, which authorize discovery and inspection of a defendant's own statements, the results of various tests, and the recorded testimony of the defendant before the grand jury (and see the Advisory Committee's Note thereon). See also, cases anticipating this broadening of criminal discovery: for example, *Cicenia* v. *Lagay,* 357 U. S. 504, 511; *United States* v. *Peace,* 16 F. R. D. 423 (D. C. S. D. N. Y. 1954); *United States* v. *Willis,* 33 F. R. D. 510 (D. C. S. D. N. Y. 1963); *United States* v. *Williams,* 37 F. R. D. 24 (D. C. S. D. N. Y. 1965); *United States* v. *Nolte,* 39 F. R. D. 359 (D. C. N. D. Cal. 1965); *State* v. *Johnson,* 28 N. J. 133, 145 A. 2d 313 (1958); *People ex rel. Lemon* v. *Supreme Court,* 245 N. Y. 24, 156 N. E. 84 (1927).

Among the commentators who have argued in favor of broadening criminal discovery are Brennan, The Criminal Prosecution: Sporting Event or Quest for Truth? 1963 Wash. U. L. Q. 279; Traynor, Ground Lost and Found in Criminal Discovery, 39 N. Y. U. L. Rev. 228 (1964); Goldstein, The State and the Accused: Balance of Advantage in Criminal Procedure, 69 Yale L. J. 1149 (1960); Note, Developments in the Law—Discovery, 74 Harv. L. Rev. 940, 1051–1063 (1961). Of particular relevance to the question of grand jury secrecy are: Sherry, Grand Jury Minutes: The Unreasonable Rule of Secrecy, 48 Va. L. Rev. 668 (1962); and Calkins, Grand Jury Secrecy, 63 Mich. L. Rev. 455 (1965).

the secrecy of the grand jury minutes is minimal and also admits the persuasiveness of the arguments advanced in favor of disclosure, it cannot fairly be said that the defense has failed to make out a "particularized need." The showing made by petitioners, both in the trial court and here, goes substantially beyond the minimum required by Rule 6 (e) and the prior decisions of this Court.[18] The record shows the following circumstances:

1. The events as to which the testimony in question related occurred between 1948 and 1955. The grand jury testimony was taken in 1956, while these events were relatively fresh. The trial testimony which petitioners seek to compare with the 1956 grand jury testimony was not taken until 1963. Certainly, there was reason to assay the latter testimony, some of which is 15 years after the event, against the much fresher testimony before the grand jury.[19]

2. The motions in question involved the testimony of four of the eight government witnesses. They were key witnesses. The charge could not be proved on the basis of evidence exclusive of that here involved.

3. The testimony of the four witnesses concerned conversations and oral statements made in meetings. It was largely uncorroborated. Where the question of guilt or innocence may turn on exactly what was said, the defense is clearly entitled to all relevant aid which is

---

[18] None of the reasons traditionally advanced to justify nondisclosure of grand jury minutes (see MR. JUSTICE BRENNAN's dissenting opinion in *Pittsburgh Plate Glass*, 360 U. S., at 405) are significant here. For criticism of the traditional arguments against disclosure, see Brennan, *op. cit. supra*, note 17; Sherry, *op. cit. supra*, note 17; Calkins, *op. cit. supra*, note 17.

[19] "Every experienced trial judge and trial lawyer knows the value for impeaching purposes of statements of the witness recording the events before time dulls treacherous memory." *Jencks* v. *United States*, 353 U. S. 657, 667.

reasonably available to ascertain the precise substance of the statements.

4. Two of the witnesses were accomplices, one of these being also a paid informer. A third had separated from the union and had reasons for hostility toward petitioners.

5. One witness admitted on cross-examination that he had in earlier statements been mistaken about significant dates.

A conspiracy case carries with it the inevitable risk of wrongful attribution of responsibility to one or more of the multiple defendants. See, e. g., United States v. Bufalino, 285 F. 2d 408, 417–418 (C. A. 2d Cir. 1960). Under these circumstances, it is especially important that the defense, the judge and the jury should have the assurance that the doors that may lead to truth have been unlocked. In our adversary system for determining guilt or innocence, it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant fact.[20] Exceptions to this are justifiable only by the clearest and most compelling considerations. For this

---

[20] See, for example, Alford v. United States, 282 U. S. 687, where this Court reversed a trial court's ruling which deprived defense counsel of an opportunity to inquire into the background of an important government witness; United States v. Andolschek, 142 F. 2d 503, 506 (C. A. 2d Cir. 1944) (L. Hand, J.), where it was held the Government must produce reports—otherwise privileged—upon which the prosecution was based; United States v. Coplon, 185 F. 2d 629, 636–639 (C. A. 2d Cir. 1960) (L. Hand, J.), cert. denied, 342 U. S. 920, where the court held that defendants were themselves entitled to examine unlawfully taken tape-recordings of telephone conversations although the trial judge had determined that these recordings had not led the Government to evidence introduced at trial; and People v. Ramistella, 306 N. Y. 379, 118 N. E. 2d 566 (1954), where the court ruled the State could not use evidence of a secret identification on an automobile to prove that the automobile was stolen where it was unwilling to disclose the location of the identification mark to the defense.

reason, we cannot accept the view of the Court of Appeals that it is "safe to assume" no inconsistencies would have come to light if the grand jury testimony had been examined. There is no justification for relying upon "assumption."

In *Pittsburgh Plate Glass, supra,* the Court reserved decision on the question whether *in camera* inspection by the trial judge is an appropriate or satisfactory measure when there is a showing of a "particularized need" for disclosure. 360 U. S., at 401. This procedure, followed by production to defense counsel in the event the trial judge finds inconsistencies, has been adopted in some of the Courts of Appeals. In the Second Circuit it is available as a matter of right.[21] While this practice may be useful in enabling the trial court to rule on a defense motion for production to it of grand jury testimony—and we do not disapprove it for that purpose—it by no means disposes of the matter. Trial judges ought not to be burdened with the task or the responsibility of examining sometimes voluminous grand jury testimony in order to ascertain inconsistencies with trial testimony. In any event, "it will be extremely difficult for even the most able and experienced trial judge under the pressures of conducting a trial to pick out all of the grand jury testimony that would be useful in impeaching a witness." *Pittsburgh Plate Glass,* 360 U. S., at 410 (dissenting opinion). Nor is it realistic to assume that the trial court's judgment as to the utility of material for impeachment or other legitimate purposes, how-

---

[21] *United States* v. *Hernandez,* 290 F. 2d 86 (C. A. 2d Cir. 1961); *United States* v. *Giampa,* 290 F. 2d 83, 85 (C. A. 2d Cir. 1961). Compare *United States* v. *Micele,* 327 F. 2d 222, 226–227 (C. A. 7th Cir. 1964); *Ogden* v. *United States,* 303 F. 2d 724, 741–742 (C. A. 9th Cir. 1962); *United States* v. *Bertucci,* 333 F. 2d 292, 297 (C. A. 3d Cir. 1964); *Berry* v. *United States,* 295 F. 2d 192, 195 (C. A. 8th Cir. 1961).

ever conscientiously made, would exhaust the possibilities. In our adversary system, it is enough for judges to judge. The determination of what may be useful to the defense can properly and effectively be made only by an advocate.[22] The trial judge's function in this respect is limited to deciding whether a case has been made for production, and to supervise the process: for example, to cause the elimination of extraneous matter and to rule upon applications by the Government for protective orders in unusual situations, such as those involving the Nation's security or clearcut dangers to individuals who are identified by the testimony produced. Cf. Fed. Rule Crim. Proc. 16 (e), as amended in 1966; 18 U. S. C. § 3500 (c).

Because petitioners were entitled to examine the grand jury minutes relating to trial testimony of the four government witnesses, and to do so while those witnesses were available for cross-examination, we reverse the judgment below and remand for a new trial.

*It is so ordered.*

Mr. Justice Douglas, while joining the opinion of Mr. Justice Black, also joins Part III of the majority opinion.

Mr. Justice Black, with whom Mr. Justice Douglas joins, concurring in part and dissenting in part.

This prosecution, now approaching its second decade and third trial, is a natural offspring of the McCarthy era. For reasons set out in Part III of the Court's opinion I agree that it was reversible error for the trial court to deny petitioners' motion to examine the Grand

---

[22] See *Rosenberg* v. *United States,* 360 U. S. 367, 371; *United States* v. *Cotter,* 60 F. 2d 689, 692 (C. A. 2d Cir. 1932) (L. Hand, J.); *United States* v. *Coplon,* 185 F. 2d 629, 636–640 (C. A. 2d Cir. 1950) (L. Hand, J.), cert. denied, 342 U. S. 920.

Jury minutes. While I disagree with the Court's hold-
ing that the indictment states facts sufficient to charge
the offense of defrauding the United States in violation
of 18 U. S. C. § 371, I shall devote my attention in
this opinion to the Court's holding that petitioners are
"in no position to attack the constitutionality of § 9 (h)"
of the National Labor Relations Act, as amended by
the Taft-Hartley Act, as a bill of attainder. I believe
it is a flat denial of procedural due process of law for
this Court to allow these petitioners to be tried for the
third time without passing on the validity of § 9 (h).

## I.

The indictment charges, as it was compelled to charge
in order to show that the offense of conspiring to defraud
the Government had been committed, that the peti-
tioners' alleged fraud interfered with "lawful" and
"proper" functions of government. Had the indictment
failed to charge that the functions obstructed were
"lawful" and "proper," it would have been fatally defec-
tive under our prior cases accepted by the Court today
which state that an essential element of the crime of
defrauding the Government is the obstruction of a "law-
ful" and "legitimate" governmental function. *United
States* v. *Johnson,* 383 U. S. 169, 172; *Glasser* v. *United
States,* 315 U. S. 60, 66; *Hammerschmidt* v. *United
States,* 265 U. S. 182, 188; *Haas* v. *Henkel,* 216 U. S. 462,
479. Accordingly, in holding that petitioners have no
right to challenge § 9 (h), the Court must conclude that
even if § 9 (h) is a bill of attainder, petitioners have
nevertheless conspired to interfere with some lawful and
legitimate function of government. Yet the Court no-
where points out any governmental function that could
have been interfered with by the false affidavits except
functions performed under § 9 (h) which the Court for
purposes of this argument assumes is a bill of attainder.

But if the provisions of § 9 (h) requiring non-Communist affidavits constitute a bill of attainder then no requirement of that section and no services performed or refused to be performed under it can constitute either lawful or legitimate functions of government. And surely if § 9 (h) is a bill of attainder, the filing of any non-Communist affidavits under § 9 (h), whether true or false, cannot be said to have interfered with any lawful or legitimate function of the Labor Board. It would indeed be strange if the Court means that it is a lawful and legitimate function of the Government to enforce and carry out in any part a bill of attainder against these petitioners. But if this is what the Court means, then it frustrates the Framers' intention that a bill of attainder must never be given the slightest validity or effect in this free country, either directly or indirectly.

Our Government has not heretofore been thought of as one which sends its citizens to prison without giving them a chance to challenge validity of the laws which are the very foundation upon which criminal charges against them rest. Yet the Court refuses to allow petitioners to attack § 9 (h) on the ground that "the claimed invalidity of § 9 (h) would be no defense to the crime of conspiracy charged in this indictment . . . ." It is indeed a novel doctrine if the unconstitutionality of a law which forms the very nucleus of a criminal charge cannot be a defense to that charge. Certainly the Court does not deny that violation of the § 9 (h) requirement for non-Communist oaths is an essential if not indeed the only ingredient of the crime for which the Government seeks to place petitioners in jail. The indictment properly charged unlawful compliance with § 9 (h) as an essential element, if indeed not the whole crime laid at petitioners' door. Congress has passed no law which requires the Court to refuse to consider petitioners' challenge to the constitutionality of § 9 (h). Nor are there any prior cases of

this Court which require us today to tell citizens that the courts of our land are not open for them to challenge bills of attainder under which they may be sent to prison. The holding is solely and exclusively a new court-made doctrine.

The cases relied on by the majority cannot, in my judgment, properly be stretched to support the Court's holding that petitioners have no right to challenge § 9 (h) as a bill of attainder. In *United States* v. *Kapp,* 302 U. S. 214, relied on by the Court, the defendants conspired through use of false statements to secure benefit payments under the Agricultural Adjustment Act to which they were not entitled under the Act itself. For this they were indicted. At trial they contended that they could not be prosecuted because the Agricultural Adjustment Act had been declared unconstitutional. This Court properly rejected that defense. In that case Kapp was convicted of conspiring to get money out of the Treasury to which he had no possible right whether the statute was constitutional or unconstitutional. The alleged conspiracy was to defraud the Government of money by people who, under no circumstances, had or could have had any legitimate claim to the money. So also in *Kay* v. *United States,* 303 U. S. 1, as in *Kapp,* the defendants made false statements in order to get benefits from the Government which were not due them whether the Home Owners' Loan Act was constitutional or unconstitutional. In none of the other cases relied on by the Court today do we have the situation present in this case. Here, if § 9 (h) is unconstitutional, petitioners' union has always been entitled to services of the Labor Board before any affidavits were filed, when they were filed, or after they were filed. By filing false affidavits petitioners got for their union no more than it was entitled to if the statute is unconstitutional. In

this situation if § 9 (h) is a bill of attainder, the Government has been deprived of nothing and defrauded of nothing.

Let us consider for a moment other similar cases in which efforts might be made to deprive citizens of their right to challenge unconstitutional laws bearing down upon them. For example, what if a State wanted to impose racial or religious qualifications for voting in violation of the Fourteenth and Fifteenth Amendments and that State refused to register people to vote until they had filed affidavits swearing that they were not of a proscribed color or religion? If a person filed a false affidavit under such a law could it be possible that this Court would hold the person had defrauded the State out of something it was entitled to have? Take another example. Article VI of the United States Constitution provides that ". . . no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States." Suppose Congress should pass a law requiring candidates for public office to make affidavits that they do not belong to a particular church and a candidate falsely denies his membership in that church. Is it conceivable that this Court would permit him to be barred from his office and sent to prison on the ground that the Government had been defrauded in its "lawful" and "legitimate" functions? And who would imagine that people under indictment for defrauding the Government by making false affidavits required by these unconstitutional acts would be denied in a court of justice the right to challenge such unconstitutional laws? The Court's refusal to allow these petitioners to challenge the constitutionality of § 9 (h), on which the charge against them ultimately rests, is hardly consistent with Madison's view that "independent tribunals of justice . . . will be an impenetrable bulwark against

every assumption of power in the Legislative or Execu-
tive; they will be naturally led to resist every encroach-
ment upon rights expressly stipulated for in the Con-
stitution by the declaration of rights." 1 Annals of
Congress 439 (1789).

## II.

In 1959 Congress repealed § 9 (h) of the National
Labor Relations Act and enacted § 504 of the Labor-
Management Reporting and Disclosure Act. 73 Stat. 536,
29 U. S. C. § 504 (1964 ed.). Section 504 made it a crime
for a member of the Communist Party to serve as an
officer of a labor union. Last year this Court in *United
States* v. *Brown,* 381 U. S. 437, held § 504 to be an un-
constitutional bill of attainder. In doing so, the Court
said, "Section 504 was designed to accomplish the same
purpose as § 9 (h), but in a more direct and effective
way." 381 U. S., at 439, n. 2. In this case the Govern-
ment argues with understandable brevity, feebleness and
unpersuasiveness that there is a crucial distinction be-
tween § 504, which it has to admit is a bill of attainder,
and § 9 (h) which it contends is not. This alleged cru-
cial distinction amounts to no more than an assertion that
the punishment under § 504 is more severe than that
under §9 (h). This distinction is hard to grasp and
harder to accept. Section 504 made it a crime for a
Communist to hold office in a labor union. Section
9 (h) made it just as impossible for a Communist to
hold union office, though it reached this result in a dif-
ferent way. Section 9 (h) provided that a union could
not receive the services of the Labor Board if the union
had any Communist officers and required all union officers
to file affidavits stating they were not Communists as a
condition of their unions' receiving the Board's services.
The practical effect of § 9 (h) was that a union officer
who was a Communist was forced either to file a false
affidavit, for which he could have been prosecuted, or to

give up his office. For this reason the differences between § 9 (h) and § 504 upon which the Government relies are too slight, too insubstantial, and too vaporlike to justify the conclusion that one section is a bill of attainder and the other is not. *Brown* held that § 504 was a bill of attainder because it attainted all Communists and declared them unfit to hold office in a labor union. The heart of the holding in *Brown* was that Communists had been so attainted through legislative findings rather than a due process judicial trial. Section 9 (h) amounts to exactly the same sort of attainder by legislative fiat. It would be a distinct and a quick retreat from *Brown* to hold § 9 (h) is not a bill of attainder though its successor, identical in purpose and practical effect, is a bill of attainder. I am not willing to make this retreat either directly, or indirectly by refusing to face the issue here and now.

Petitioners now face their third trial and possible prison sentences just as though the Court had today upheld § 9 (h). I must say with considerable regret that future historians reporting this case may justifiably draw an inference that it is the petitioners, whatever may be their offense, and not the Government who have been defrauded. For petitioners, if convicted and sentenced again, unlike the Government, actually will have been deprived of something—their freedom. They will be in jail, having been denied by their Government the right to challenge the constitutionality of § 9 (h) which, when it is challenged, must in my judgment be held to be the constitutionally doubly prohibited freedom-destroying, legislative bill of attainder.