See also, D.C., 308 F.Supp. 1207.

**STATE OF ILLINOIS, Plaintiff,**

v.

**HARPER & ROW PUBLISHERS,
INC., et al., Defendants.
And Related Cases.**

**No. 67 C 1899.**

United States District Court,
N. D. Illinois, E. D.

Oct. 7, 1969.

───────◆───────

## MEMORANDUM OPINION

DECKER, District Judge.

Pursuant to 28 U.S.C. § 1407, more than forty separate antitrust actions have been transferred to this court for consolidated discovery and pretrial proceedings. Originally instituted in eight judicial districts, the private treble damage suits seek compensation from publishers and wholesalers for alleged conspiracies which inflated the prices for children's editions of library books. The plaintiffs are state and local governments, public schools, and public libraries.

In an ambitious discovery program, the parties have deposed approximately one hundred witnesses during the last four months. Since many of the central events occurred six to ten years ago, the deponents' memories are often incomplete. Some witnesses have been deliberately evasive. Other deponents have forgotten major incidents involving the alleged price fixing and cannot

remember receiving incriminating correspondence. Deposition testimony sometimes conflicts with documentary evidence which the witnesses personally prepared several years ago. The plaintiffs therefore seek to inspect the grand jury transcripts of eleven witnesses who testified about three years ago.[1] In addition, the public schools and libraries ask that the publisher and wholesaler defendants produce all debriefing memoranda that summarize the deponents' grand jury testimony.

After discussing whether the grand jury transcripts should be released, this opinion will outline the procedure which will govern the disposition of additional requests for the disclosure of transcripts. Then, the defendants' two objections to revealing their debriefing documents, the attorney-client privilege and the work product doctrine, will be analyzed.

## I. GRAND JURY TRANSCRIPTS.

■■ Rule 6(e) of the Federal Rules of Criminal Procedure declares that:

"[Persons] may disclose matters occurring before the grand jury only when so directed by the court preliminarily to or in connection with a judicial proceeding * * * No obligation of secrecy may be imposed upon any person except in accordance with this rule."

The disclosure of grand jury minutes is committed to the sound discretion of the trial judge. Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 399, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959). In cases of particularized need, the long established policy of grand jury secrecy is lifted discretely and limitedly. To illustrate, in United States v. Procter & Gamble, 356 U.S. 677, 683, 78 S.Ct. 983, 987, 2 L.Ed.2d 1077 (1958), the Supreme Court explained that "the use of the

────────────

1. In 1966 the federal government convened a criminal grand jury to investigate the pricing of library editions of children's books. Although nearly ninety witnesses testified, the United States decided not to seek indictments.

grand jury transcript at the trial to impeach a witness, to refresh his recollection, to test his credibility and the like" constitute particularized need.[2]   See Dennis v. United States, 384 U.S. 855, 873–874, 86 S.Ct. 1840, 16 L.Ed.2d 973, (1966).

### A.  In Camera Inspection.

■ Plaintiffs want to examine the transcripts of John Callaway, Joseph Christie, Francis H. Dyckman, Jr., S. Gordon Ferguson, Alan C. Hood, Thomas Maher, Paul D. Rust, Frank Scioscia and James L. Thompson.[3]   The publishers and wholesalers maintain that the transcripts are sought purely for discovery purposes.   But the vast majority of the witnesses are beyond the subpoena power of the forum court.   The depositions are therefore evidentiary.   The use of grand jury minutes to refresh the deponents' recollection or to impeach their statements is equivalent to their use at trial.

During the depositions, each witness demonstrated a remarkable lack of memory concerning critical events in controversy.   This court's *in camera* inspection of the witnesses' grand jury transcripts reveals that each witness' recall was substantially more extensive in 1966.   In each instance, there exist material discrepancies on important factual issues or significant facts that the witness failed to recollect.   Compare Atlantic City Electric Co. v. A. B. Chance Co., 313 F.2d 431, 434 (2nd Cir. 1963); Consolidated Edison Co. of N. Y. v. Allis-Chalmers Mfg. Co., 217 F.Supp. 36, 38 (S.D.N.Y.1963).   Furthermore, as

Judge Boldt stated in In re Sellers, 32 F.R.D. 473, 477 (N.D.Ill.1962):

"[T]he likelihood that the witness' recollection will become even dimmer by the time of trial is itself an important reason for allowing disclosure at this stage of the proceedings."

In the interest of justice, there is a compelling need for the disclosure of the requested minutes.

The most relevant parts of the transcripts are interwoven with the remainder of the witnesses' testimony, so that various portions should not be segregated from one another.   The entire transcripts will be released since they contain no extraneous matter.   Neither the votes nor the deliberations of the grand jurors appear in the minutes.

The following protective order will guard the integrity of all released minutes:

"The transcript is provided solely for the personal perusal of counsel and shall be used only for such further interrogation of deponents as may be authorized.   No part of the transcript shall be copied or reproduced, and the entire transcript shall be returned to this court when its use has been completed."

See Allis-Chalmers Mfg. Co. v. City of Fort Pierce, 323 F.2d 233, 237 (5th Cir. 1963).

### B.  Additional Transcripts.

Since the public schools and libraries will undoubtedly seek to inspect additional grand jury minutes, the procedure governing their release may appropriately be discussed at this time.[4]

2. Compare United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 234, 60 S.Ct. 811, 849, 84 L.Ed. 1129 (1940):
   "[A]fter the grand jury's functions are ended, disclosure is wholly proper where the ends of justice require it."

3. Two additional grand jury witnesses, James F. Heidelberger and William J. Hoocker, are either deceased or too sick to be deposed.   Other than a declaration of relevancy, plaintiffs have advanced no showing of particularized need. Moreover, the testimony recorded in the transcripts of Heidelberger and Hoocker would be inadmissible at trial.   Accordingly, these transcripts will not be released.

4. The conclusions reached in this section also provide an alternative ground for releasing the nine transcripts considered in part *I.A. supra.*

Five policy reasons have traditionally been advanced for imposing secrecy upon grand juries.[5] The only relevant justification for secrecy here is encouraging free future disclosure by individuals with information about antitrust violations. See City of Philadelphia v. Westinghouse Electric Corp., 210 F.Supp. 486, 490 (E.D.Pa.1962). In particular, since potential witnesses are normally employees, customers or suppliers of the offenders, the witnesses might suffer retaliation if their testimony became public. On the other hand, Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840 (1966), significantly eroded the principle of grand jury secrecy when its main justification is encouraging the subsequent disclosure of crimes. In criminal prosecutions, the witnesses' grand jury minutes must be furnished directly to the defendant once particularized need is established, thus publicizing the earlier testimony.

Moreover, the Supreme Court indicated that a showing of particularized need varies depending upon the importance of maintaining secrecy in each individual situation.[6] When a treble damage suit is tried, grand jury witnesses are usually called to testify. Their earlier disclosure may then become public knowledge, thus exposing them to potential retaliation. Release of the grand jury minutes during discovery merely advances the same dangers created at trial.[7] In his dissent to Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 406, 79 S.Ct. 1237, 1244, 3 L.Ed.2d 1323 (1959), Mr. Justice Brennan explicated that:

> "Disclosure of his testimony before the grand jury is hardly likely to result in any embarrassment that his trial testimony has not already produced. 'If he tells the truth, and the truth is the same as he testified before the grand jury, the disclosure of the former testimony cannot possibly bring to him any harm * * * which his testimony on the open trial does not equally tend to produce.' 8 Wigmore, Evidence (3d ed. 1940), § 2362, at p. 725."

Furthermore, relatively little secrecy surrounds the 1966 children's books grand jury. The defendants' attorneys contacted numerous witnesses immedi-

---

5. See United States v. Rose, 215 F.2d 617, 628–629 (3rd Cir. 1954):
   "(1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt." See also United States v. Procter & Gamble, 356 U.S. 677, 681 n. 6, 78 S.Ct. 983 (1958).

6. "Certainly in the context of the present case, where the Government concedes that the importance of preserving the secrecy of the grand jury minutes is minimal and also admits the persuasiveness of the arguments advanced in favor of disclosure, it cannot fairly be said that the defense has failed to make out a 'particularized need.'" 384 U.S. 871–872, 86 S.Ct. 1840, 1850.

7. After reviewing the judiciary's increasing willingness to release grand jury minutes, Mr. Justice Fortas recently declared that: "These developments are entirely consonant with the growing realization that disclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice." 384 U.S. at 870, 86 S.Ct. at 1849. Dennis v. United States, 384 U.S. 855, 870, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). While the Supreme Court has not yet authorized automatic disclosure in treble damage actions, the scope of discovery is normally wider in civil litigation than in criminal prosecutions.

ately after their appearance and recorded the substance of the witnesses' testimony in debriefing memoranda.[8] After preparing their own testimony summaries, other witnesses circulated their debriefing statements to their corporate superiors. The publishers' and wholesalers' reliance upon the principle of grand jury secrecy is designed to conceal from the public schools and libraries relevant information which the defendants have already assembled.

■ During the nine depositions discussed in part *I. A. supra,* the witnesses were repeatedly unable to recall significant facts. What recollection they could muster was often so vague as to be of only limited value. Their testimony sometimes conflicted with documentary evidence, including correspondence to and from the witnesses themselves. Since the importance of preserving the instant grand jury minutes is minimal, *in camera* analyses will not be conducted in the future if the public schools and libraries demonstrate similar recalcitrance and unexplained failures to remember.[9] Such a showing will constitute particularized need justifying the release of the witnesses' grand jury transcripts.[10]

## II. DEBRIEFING MEMORANDA.

Plaintiffs' examination of additional grand jury minutes will require that a witness first be deposed. As a more complete aid to discovery, the public schools and libraries therefore seek to inspect the debriefing memoranda which were prepared soon after the witnesses testified before the grand jury. The debriefing statements are essentially factual summaries of the witnesses' testimony.[11] The documents may substantially refresh future deposition recollection, thereby rendering extensive transcript requests unnecessary. Furthermore, the debriefing statements may discuss relevant aspects of the alleged price fixing conspiracy which were not probed by the grand jury, thus supplementing

---

8. One law firm interviewed at least ten witnesses, including several employees of unrelated companies.

9. In a related context, Chief Judge Pence explained that:
"It is now well settled that disclosure rather than suppression of relevant materials in grand jury minutes ordinarily promotes the proper administration of justice, both civil and criminal, and it is no longer necessary in every case that the trial judge, like a fussy hen, scratch through the grand jury transcript *in camera* before permitting disclosure of relevant testimony therein."
State of Washington v. American Pipe & Const. Co., 41 F.R.D. 59, 63–64 (S.D. Cal.1966).

10. Having invaded the grand jury secrecy by their debriefing of the witnesses, the defendants have advanced no compelling policy justification for withholding the transcripts from the plaintiffs. Therefore the public schools and libraries may be entitled to examine the minutes prior to deposing the witnesses. Rather than releasing the minutes in a wholesale fashion, the court might disclose only the transcripts of those witnesses whom the plaintiffs actually expect to question. But, the broad holding of United States v. Procter & Gamble, 356 U.S. 677, 683, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958), suggests that such a decision could be appropriate for certification under 28 U.S.C. § 1292(b), thus completely halting discovery for many months. At this stage of the litigation, an early release of the minutes does not warrant the substantial delay which might ensue.

11. The memoranda were filed with this court in sealed envelopes, accompanied by a precise factual statement specifying how the documents were prepared.
In their briefs, several defendants object strenuously to any unsealing of the envelopes, including *in camera* inspection. The envelopes therefore remain unopened. But as a consequence, ambiguities and omissions in defendants' factual statements have necessarily been construed against them.

the minutes which will be released to-day.[12]

When the debriefing documents were prepared, counsel often assisted witnesses in their recollection.[13] Defendants therefore resist production under F.R.Civ.P. 34, maintaining that the documents are insulated by the attorney-client privilege and by the work product doctrine.

## A. Attorney-Client Privilege.

■■ Communications from a client to a lawyer may be immune from discovery. See, e. g., Radiant Burners, Inc. v. American Gas Ass'n., 320 F.2d 314, 324 (7th Cir. 1963).[14] Either of two varieties of the attorney-client privilege can exist. First, when the debriefing statements were prepared, counsel and the witnesses may have had a personal attorney-client relationship. While numerous defendants claim such immunity, they have failed to present any factual support for their assertions. With one exception,[15] the attorneys did not (1) render personal legal advice after the witnesses completed their grand jury testimony, (2) advise them on other personal matters, or (3) bill the witnesses for their services. Since the lawyers'

respective law firms were counsel for the witnesses' employers, the debriefing consultations were apparently conducted as a favor to the corporations. The documents are thus not protected by a personal attorney-client privilege.

■ Second, a corporate attorney-client privilege could have existed. See, e. g., United States v. United Shoe Machinery Corp., 89 F.Supp. 357, 359–360 (D.Mass.1950); Radio Corp. of America v. Rauland Corp., 18 F.R.D. 440, 443 (N.D.Ill.1955). But only communications from certain employees to the company's attorney create that relationship. Specifically, a responsible member of the corporation's management or control group must seek legal advice about corporate affairs. See, e. g., City of Philadelphia v. Westinghouse Electric Co., 210 F.Supp. 483, 485 (E.D.Pa.1962).[16] Moreover, the corporate official must be in a position to influence the decision about which legal counsel is sought. In Natta v. Hogan, 392 F.2d 686, 692 (10th Cir. 1968), the Tenth Circuit stated that:

> "[T]he test is whether the person has the authority to control, or substantially participate in, a decision regarding action to be taken on the advice

12. For example, in order to clarify the scope of the grand jury's inquiry, a witness may have specified that there were no questions concerning various enumerated incidents of dubious legality. Such a debriefing statement could be valuable to refresh a witness' recollection or to impeach deposition statements.

13. The memoranda may have been designed to circumvent the secrecy surrounding grand juries. By aggregating the statements from most subpoenaed witnesses, antitrust defendants might determine what evidence was presented to the grand jury.

14. The Seventh Circuit held that the attorney-client privilege protects "confidential disclosure of information by the client to its attorney to gain the legal advice sought thereby."

15. Prior to Bonsal's grand jury appearance, his lawyers prepared wills for the

family, thus establishing a personal attorney-client relationship. Bonsal's debriefing memorandum will be returned unopened.

16. "[I]f the employee making the communication, of whatever rank he may be, is in a position to control or even to take a substantial part in a decision about any action which the corporation may take upon the advice of the attorney, or if he is an authorized member of a body or group which has that authority, then, in effect, he is (or personifies) the corporation when he makes his disclosure to the lawyer and the privilege would apply. In all other cases the employee would be merely giving information to the lawyer to enable the latter to advise those in the corporation having the authority to act or refrain from acting on the advice."

of a lawyer, or is an authorized member of a group that has such power."
See also Garrison v. General Motors Corp., 213 F.Supp. 515 (S.D.Cal.1963).[17]

■ In the instant cases, the debriefing memoranda were created to assist the publishers and wholesalers in defending the actions instituted by the federal government and private treble damage plaintiffs. Only Bonsal and Milne were in a position to influence their company's litigation strategy in these lawsuits.[18] While other witnesses, such as sales executives and regional managers, might have shaped the pricing policies concerning library editions, they did not participate in the corporate problem about which legal advice was sought —the company's litigation response to the price fixing cases. Accordingly, the debriefing documents are not protected by a corporate attorney-client privilege.

### B. Work Product Doctrine.

■ The work product doctrine protects counsel's legal strategies and thought processes from discovery by an adversary. Hickman v. Taylor, 329 U.S. 495, 509, 67 S.Ct. 385, 91 L.Ed. 451 (1947). The principle does not, however, insulate non-legal services rendered by persons who happen to be attorneys.

The statements may be divided into two categories.[19] In the first group, the lawyers functioned primarily as investigators. By asking questions and recording the answers, they attempted to reconstruct the witnesses' grand jury testimony. Such peripheral participation by a lawyer does not convert a factual summary into his work product. In Bifferato v. States Marine Corp., 11 F.R.D. 44, 46–47 (S.D.N.Y.1951), Judge Weinfeld expounded that:

"The rationale underlying * * * [Hickman v. Taylor] was intended to apply only when [an attorney] acts in his true professional capacity.

"It is a fair inference that the procurement of the statements * * * was not the result of any basic professional relationship between the lawyer * * * and the defendant, or that it required the training, skill and knowledge of a lawyer or the essential integrity implicit in the lawyer-client relationship. The services were those normally rendered by an investigator or claim agent * * *"

See Diamond v. Mohawk Rubber Co., 33 F.R.D. 264, 267 (D.Colo.1963).

■ Second, certain statements, such as those of Hoocker and Rowe, contain counsel's "recollections, observations, comments and impressions about [the witness'] report of his appearance before the grand jury." Assuming *arguendo* that these nebulous additions constitute work product, these documents are only entitled to limited protection since they remain basically summaries

---

17. Defendants rely heavily upon Continental Oil Company v. United States, 330 F.2d 347, 349 (9th Cir. 1964). In an abbreviated opinion, the Ninth Circuit concluded that personal and corporate attorney-client relationships existed. The Court did not analyze which corporate officials' consultations create the privilege.

18. These individuals' memoranda will be returned in the sealed envelopes.
Mr. Milne "participated in—and in some instances controlled—the decisions which William Morrow and Company made in connection with the corporate conduct which forms the basis of these actions."

19. According to Golden Press, Inc., its document B–1 "is not a debriefing memoranda * * *
"The document consists primarily of statements by counsel. Only a very small portion of the memorandum concerns statements made by the witness during the course of his examination by the grand jury."
The statement will therefore be returned to the defendant.

of testimony.[20] Under F.R.Civ.P. 34, work product materials may properly be examined by the opposing party if there exists good cause or special circumstances which justify invading the attorney's thought processes. See, e. g., Hanover Shoe, Inc. v. United Shoe Mach. Corp., 207 F.Supp. 407, 410–411 (M.D. Pa.1962).[21] In determining whether good cause has been established, the harm caused by revealing lawyers' work product is compared with the need for discovery. In United States v. Swift & Co., 24 F.R.D. 280, 284 (N.D.Ill.1959), Judge Hoffman thus declared that:

"The privilege of the lawyer's work product and the showing of good cause sufficient to overcome it are interdependent, and when, as here, the factors supporting the claim of privilege are weak, the requisite showing of good cause is correspondingly lessened."

The instant antitrust cases are unusual because the alleged price fixing conspiracy was particularly active six to ten years ago. Although the plaintiffs have voluminous documents available for examination and have deposed a large number of witnesses, the intervening years continue to obscure many crucial factual questions. The witnesses have long since forgotten the details of their operations; frequently, they cannot even remember major incidents in which deviations from "net" prices were punished. Quite regularly, witnesses confronted with copies of their own letters have little or no recall. Similarly, deponents often do not remember receiving incriminating correspondence, nor do they offer reasonable explanations for apparent admissions that their prices were illegally inflated. If the conspiracy existed, plaintiffs' inability to prepare fully for trial results from the publishers and wholesalers' concealment of the price fixing. As public bodies, the plaintiff schools and libraries are charged with a responsibility to protect the taxpayers' finances.

When compared to the defendants' minimal work product claims, the plaintiffs' need for discovery establishes good cause under F.R.Civ.P. 34. Plaintiffs have demonstrated special circumstances which justify the disclosure of counsel's comments and notations that were interspersed among the factual summaries of grand jury testimony. See, e. g., Bifferato v. States Marine Corp., 11 F.R.D. 44, 47 (S.D.N.Y.1951); Zenith Radio Corp. v. Radio Corp. of America, 121 F. Supp. 792, 795 (D.Del.1954); Sharon Steel Corp. v. Travelers Indemnity Co., 26 F.R.D. 113, 115 (N.D.Ohio 1960). Accordingly, except for the Bonsal and Milne documents, all debriefing memoranda may be examined by the plaintiffs. The statements will not be returned to the defendants at this time.

---

20. Counsel have not indicated that their professional abilities were utilized; presumably, the documents do not include legal analysis nor do they discuss litigation strategy.

   If the mere physical involvement of an attorney converted documents into work product, parties could easily insulate damaging evidence from an adversary. Alternative discovery procedures, such as depositions and the production of related materials, might be less revealing than the documents clothed with immunity.

21. Contrast Alltmont v. United States, 177 F.2d 971, 978 (3rd Cir. 1950), and Hauger v. Chicago, Rock Island & Pacific Railroad Co., 216 F.2d 501, 507 (7th Cir. 1954), in which the moving parties failed to make the requisite showing of good cause. Nevertheless, the Seventh Circuit explained that:

   "The presence of special circumstances might, of course, constitute good cause for the entry of an order to produce such statements for examination." 216 F.2d 507.

   Judge Robson denied discovery of work product statements in Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co., 211 F.Supp. 736, 741 (N.D.Ill.1962), because: "Plaintiffs in their brief admit that no showing of good cause along traditional lines has been presented. They argue that the unique character of this litigation is of itself a sufficient showing of good cause for production."

## III. CONCLUSION.

Nine of the requested grand jury transcripts will be released since the plaintiffs have demonstrated particularized need. The importance of maintaining secrecy is minimal in these consolidated cases. In the future, grand jury minutes will be released without an *in camera* inspection if plaintiffs establish that the deponents have a glaring failure of memory or that their testimony contradicts reliable documentary evidence.

With respect to the debriefing documents, only the Bonsal memorandum is privileged because of a personal attorney-client relationship. Similarly, the corporate attorney-client privilege protects only the Bonsal and Milne documents. The other witnesses were not members of the corporation's control group. Finally, none of the documents is immunized by the work product doctrine since counsel's peripheral participation is outweighed by the compelling need for discovery in these actions.