**In re GRAND JURY INVESTIGATION OF CUISINARTS, INC.**

**Civ. No. H 81–224.**

United States District Court,
D. Connecticut.

June 8, 1981.

---

Alan L. Kovacs, Paul C. Bishop, Asst. Attys. Gen., Commonwealth of Massachusetts, Boston, Mass., for petitioners, the attys. general of the states of Colorado, Connecticut, Maine, Maryland, New Hampshire, New Jersey, New York, North Carolina, Rhode Island, Texas, Vermont, and Wisconsin, and the Commonwealths of Massachusetts, Pennsylvania, and Virginia.

Arthur M. Handler, Michael M. Meadvin, Golenbock. and Barell, New York City, for respondent, Cuisinarts, Inc.

Jane C. Luxton, U. S. Dept. of Justice, Antitrust Division, Washington, D. C., for United States of America.

## RULING ON MOTION TO INSPECT AND COPY GRAND JURY MATERIALS

JOSÉ A. CABRANES, District Judge:

The attorneys general of fifteen states commenced this proceeding pursuant to Rule 6(e), Fed.R.Crim.P., and Section 4F(b) of the Clayton Act, 15 U.S.C. § 15f(b). They moved the court for an order allowing them to inspect and copy all grand jury materials, including transcripts of the testimony of grand jury witnesses, and documents and exhibits gathered or generated pursuant to a federal grand jury's investigation of Cuisinarts, Inc. ("Cuisinarts"). That grand jury investigation had resulted, on September 17, 1980, in the return of an indictment and the filing of the criminal action, *United States of America v. Cuisinarts, Inc.*, Crim. No. H 80–49.

On March 30, 1981, the court heard oral argument on the motion of the state attorneys general. Oral presentations were made by an Assistant Attorney General of the Commonwealth of Massachusetts, on behalf of all fifteen attorneys general who had joined in this proceeding; by counsel for the respondent, Cuisinarts; and by a staff attorney of the Antitrust Division, United States Department of Justice, on behalf of the United States, which has maintained custody of the grand jury materials at issue here. At the close of that hearing, the court issued an oral ruling which denied petitioners' motion to inspect and copy grand jury materials. This opinion sets forth in greater detail the reasons for the court's ruling.

*Background*

This motion is part of a complex litigation resulting from the alleged unlawful conduct of Cuisinarts. A brief review of that litigation is useful to an understanding of this proceeding. Cuisinarts distributes, throughout the United States, electric appliances known as food processors. On September 17, 1980, Cuisinarts was charged, in a one-count indictment, with having conspired to fix, stabilize, and maintain the retail prices which it had previously set for its food processors. The indictment alleged that such resale price maintenance amounted to a combination and conspiracy in unreasonable restraint of interstate trade and commerce, and thus constituted a felony violation of Section One of the Sherman Act, as amended, 15 U.S.C. § 1. The indictment was returned by a grand jury which had been impaneled by this court. *See United States of America v. Cuisinarts, Inc.*, Crim. No. H 80–49 (D.Conn.).

Also on September 17, 1980, the United States filed a civil complaint against Cuisinarts, which was captioned *United States of America v. Cuisinarts, Inc.*, Civil No. H 80–559 (D.Conn.). That complaint stated essentially the same factual allegations as the grand jury's indictment, and claimed injunctive relief.

Both of the actions which had been commenced by the United States were substantially resolved on December 19, 1980. With respect to the criminal charge, defendant Cuisinarts entered, and the court accepted, a plea of *nolo contendere*. With respect to the civil action, counsel for the United States and for Cuisinarts stipulated on that date to the terms of a proposed Final Judgment.

In the criminal action, the court's acceptance of the plea of *nolo contendere* was based, in part, on certain representations by the United States. In its written statement to the court, the Justice Department had noted that its "policy is to oppose nolo pleas, unless there are unusual circumstances such that a nolo plea would be in the public interest." It added, however, that because of several factors, it "believe[d] that, in this case, the public interest is better served by the proposed disposition of the entire case at an early date in the litigation."

First, the Justice Department observed that the indictment in *United States of America v. Cuisinarts, Inc.* was "against a single corporation rather than a group of corporations and individuals." Thus, the government stated, an early disposition of the case would "allow the Justice Department to utilize its resources in other investigations." Second, the government "consider[ed] an early successful disposition of this case to be important for the overall antitrust law enforcement program of the Department," because the indictment of Cuisinarts was "the first indictment for vertical price fixing since the penalty for violating the Sherman Act was increased to a felony." [1] Finally, the United States also "consider[ed] the defendant's acquiescence, subject to the Court's determination, in a fine of $250,000, as a satisfactory resolution and an additional factor in favor of the proposed disposition." Memorandum of the United States Concerning its Proposed Plea Agreement with Cuisinarts, Inc. 1–2 (Crim. No. H 80–49, Dec. 19, 1980).

The United States argued "that $250,000 is a substantial fine and is appropriate in this case," because of "the inherent risk of litigation in the case;" because "prosecutions for vertical price fixing have been less frequent than prosecutions for horizontal price fixing . . . [;]" and because "there is no recent history of such violations[.]" Transcript of Change of Plea and Disposition ("Change of Plea") at 16 (Crim. No. H 80–49, Dec. 19, 1980). The United States argued also that it had "considered the corporate size of the defendant, its sales volume, and its net income . . . and [it] concluded that a fine of $250,000 would be substantial enough to be a significant penalty on this corporation, and yet not hinder this corporation's ability to compete in the marketplace." *Id.*[2]

After giving due consideration to the views of both the United States and Cuisinarts, the court concluded that a plea of *nolo contendere* would, in the circumstances of this case, serve the interest of the public in the effective administration of justice. Accordingly, pursuant to Rule 11(b), Fed.R. Crim.P., the court accepted defendant's plea of *nolo contendere*. *See* Change of Plea 25–29. Furthermore, pursuant to Rules 11(e)(1)(B) and 11(e)(3), Fed.R.Crim.P., the court accepted the government's recommendation concerning sentencing. Change of Plea 31–32. The court imposed a fine of $250,000, which was paid in full less than a week later.

Also on December 19, 1980, counsel for the government and for defendant stipulated to the submission of a proposed Final Judgment in the civil action. Pursuant to

1. The penalty for violating the Sherman Act was increased to a felony by Act of December 21, 1974, Pub.L.No. 93–528, § 3; 88 Stat. 1708.

2. In determining an appropriate sentence in the circumstances of this case, the court considered two additional factors. First, the maximum fine which may be imposed for a corporation's violation of the Sherman Act is $1,000,000. *See* 15 U.S.C. § 1, as amended (1974). Second, in their written submission to the court, counsel for Cuisinarts represented to the court that a fine of $250,000 would be among the most severe ever imposed for a criminal violation of the Sherman Act. If the proposed

fine of $250,000 were to be compared to all published antitrust felony fines, Cuisinarts argued, it would become apparent that "a fine of $250,000 would subject Cuisinarts to punishment greater than that imposed on almost 80 per cent of horizontal price fixing defendants." Memorandum of Defendant Cuisinarts, Inc. in Support of Plea Agreement 10 (filed Dec. 19, 1980). If that fine were to be compared to defendant's operating revenues, net income, total assets and net worth, Cuisinarts asserted, the fine would appear to be even more severe. *Id.* at 11. The government did not contest these representations by the defendant.

the Antitrust Procedures and Penalties Act ("APPA"), 15 U.S.C. § 16(b)–(h), the terms of that proposed Final Judgment and a competitive impact statement were published in the Federal Register and in newspapers of general circulation in Washington, D.C. and in this District more than sixty days prior to the projected entry of the Final Judgment. On March 20, 1981, the Justice Department certified its compliance with the requirements of the APPA, and reported that no comments of any kind had been submitted concerning the proposed Judgment. On March 26, 1981, the court found the terms of the proposed Judgment to be in the public interest, and adopted the proposed terms as its Final Judgment. Under that Judgment, which was entered on March 27, 1981, defendant Cuisinarts is enjoined from, among other things, fixing the prices at which its food processors may be resold, or from denying its products to retail dealers on account of the purchasers to whom those products might be sold. In accordance with the Judgment, notice of the terms to which Cuisinarts consented has been sent to Cuisinarts' retail dealers.

This recently-concluded litigation by the federal government—involving as it did the first criminal prosecution for vertical price fixing in many years, at least since the penalty for violating the Sherman Act was increased to a felony in 1974—has spawned a large, and possibly growing, number of cases involving private consumers and state governments. Within weeks of the federal indictment, a number of private antitrust actions had been filed against Cuisinarts or its retailers. On January 16, 1981, the Judicial Panel on Multidistrict Litigation ("JPML") ordered, pursuant to 28 U.S.C. § 1407, that eight such actions be consolidated for pre-trial proceedings in this court.[3] Pursuant to the JPML's order, those consolidated proceedings are captioned *In Re Cuisinart Food Processor Antitrust Litigation, MDL Docket No. 447.* On February 23, 1981, the JPML entered conditional transfer orders in four other cases against Cuisinarts and its retailers. On March 11, 1981, absent objection, these orders became final and the four so-called "tag-along" cases were consolidated for pre-trial proceedings along with the other cases already before this court.[4] Among these four cases was a *parens patriae* action brought by the Commonwealth of Massachusetts.[5]

A second *parens patriae* action has also become part of this litigation. On February 20, 1981, the state of New Jersey commenced a *parens patriae* action, *State of New Jersey v. Cuisinarts, Inc.*, in the United States District Court for the District of New Jersey. On March 2, 1981, the parties stipulated to the transfer of that action to this court pursuant to 28 U.S.C. § 1404, and on March 3, 1981, the District Court in New Jersey ordered that transfer. Counsel for the state of New Jersey appeared at the first pre-trial conference in the consolidated

---

**3.** The eight cases which, on January 16, 1981, were consolidated by order of the JPML are listed below. The dates on which those actions were first filed, and the courts from which they were transferred, are indicated in parentheses.

*Joan Sacarob, et al. v. Cuisinarts, Inc.* (D.Conn. Sept. 22, 1980)
*Belle Linda Gayer, etc. v. Cuisinarts, Inc., et al.* (S.D.Cal. Sept. 23, 1980)
*Janet Webber Bahr, etc. v. Marshall Field & Co., Inc.* (N.D.Ill. Sept. 30, 1980)
*Gloria Ehrlich, etc. v. Crate & Barrel, Inc.* (N.D.Ill. Sept. 30, 1980)
*Renee Logan v. Cuisinarts, Inc.* (D.Mass. Oct. 7, 1980)
*Frederic Blum v. Cuisinarts, Inc.* (D.Conn. Oct. 8, 1980)
*Fred Cohn, et al. v. Cuisinarts, Inc., et al.* (D.Conn. Oct. 8, 1980)
*Basic Living Products, Inc., etc. v. Cuisinarts, Inc.* (N.D.Cal. Oct. 20, 1980)

**4.** The four so-called "tag-along" cases, which were transferred to this court on March 11, 1981, are listed below. The dates on which those actions were first filed, and the courts from which they were transferred, are indicated in parentheses.

*Agnes Eisenberger v. Cuisinarts, Inc.* (S.D. N.Y. Oct. 28, 1980)
*Commonwealth of Massachusetts, et al. v. Cuisinarts, Inc.* (D.Mass. Oct. 30, 1980)
*Robert I. Harwood, etc. v. Federated Department Stores, Inc.* (S.D.N.Y. Nov. 21, 1980)
*Yvonne S. Archer v. Federated Department Stores, Inc., et al.* (S.D.N.Y. Nov. 28, 1981)

**5.** *See* note 4, *supra.*

litigation on March 5, 1981, and the New Jersey *parens patriae* action has been a full part of all pre-trial proceedings since that date.

One other private action was recently transferred to, and dismissed by, this court. On April 3, 1981, the JPML ordered that *Audrey Schenk v. Carl Sontheimer, et al.,* which had been filed on March 19, 1981, be transferred from the United States District Court for the Southern District of New York to this court for consolidation with the other thirteen food processor antitrust actions then pending. The transfer of the *Schenk* case was effective as of May 11, 1981. On May 29, 1981, plaintiff Schenk filed a motion for voluntary dismissal of her action, with prejudice. On June 1, 1981, the court granted the motion, absent objection, with prejudice to plaintiff Schenk, but without prejudice to any members of the putative class which she claimed to represent.

Thus thirteen civil actions are presently before this court for consolidated pre-trial proceedings. Of these, two are *parens patriae* actions. Of the remaining eleven cases, seven include claims, under Rule 23, Fed.R.Civ.P., for the certification of a nationwide class of purchasers of Cuisinart food processors.[6]

Before the court, in this proceeding, were the attorneys general of fifteen states. These included Massachusetts and New Jersey, which have already brought *parens patriae* actions, and thirteen other states which are apparently contemplating such actions.[7]

All of these states acted pursuant to Section 4F(b) of the Clayton Act, 15 U.S.C. § 15f(b), and Rule 6(e), Fed.R.Crim.P. They all sought, as the motion filed by the State of Connecticut put it, "an order allowing [them] to inspect and copy all grand jury materials, including transcripts of the testimony of grand jury witnesses, and documents and exhibits gathered or generated pursuant to the federal grand jury's investigation which resulted in the ... complaint [in *United States v. Cuisinarts, Inc.,* Crim. No. H 80–49]." Motion to Inspect and Copy Grand Jury Materials (Jan. 5, 1981).[8]

Petitioners' motion was directed to the discretion of the court. *Douglas Oil Co. v. Petrol Stops Northwest ("Douglas Oil"),* 441 U.S. 211, 223, 99 S.Ct. 1667, 1675, 60 L.Ed.2d 156 (1979). The court reviewed the thorough memoranda of all counsel, and the authorities cited in them. It also considered the particular circumstances of this litigation. For the reasons set forth below, the court denied the motion of the state attorneys general, and accordingly shall not, at this time and as part of this proceeding, permit the disclosure of any of the materials which had been gathered or generated in connection with the grand jury's investigation of Cuisinarts.

*The Court's Jurisdiction*

█ Petitioners originally filed this motion as part of the government's *criminal* action against Cuisinarts (Crim. No. H 80–49). However, at oral argument, Cuisinarts challenged, for the first time, the jurisdiction of the court to decide the motion of the

**6.** Although the corporate name of the respondent is Cuisinarts, Inc., the trade name of its food processor omits the final "s" ("Cuisinart"). The seven cases which include claims for the certification of a nationwide class of Cuisinarts' purchasers include the *Archer, Blum, Cohn, Eisenberger, Harwood, Logan,* and *Sacarob* actions. *See* notes 3 and 4, *supra*.

**7.** On January 5, 1981, the state of Connecticut, by its attorney general, filed the first of the motions which are under consideration in this proceeding. Subsequently, the attorneys general of fourteen other states filed identical motions, along with, in most cases, identical supporting papers. These states, with the dates of their filings indicated in parentheses, include:

North Carolina (Jan. 12, 1981); Maine, Massachusetts, New Hampshire, New Jersey, New York, Rhode Island (joint motion filed on Jan. 12, 1981); Maryland (Jan. 20, 1981); Pennsylvania (Jan. 28, 1981); Colorado (Jan. 30, 1981); Vermont (Jan. 30, 1981); Virginia (Feb. 6, 1981); Wisconsin (Feb. 13, 1981); and Texas (Mar. 13, 1981). Because all of the states which appear as petitioners in this proceeding rely on the same statutory authority, and seek the same action by the court, the court shall, in this opinion, refer to their requests as a single Motion to Inspect and Copy Grand Jury Materials.

**8.** *See* note 7, *supra*.

state attorneys general as part of that criminal action. *See* Transcript of Proceedings on Motion to Obtain Grand Jury Materials ("Tr.") 52–56 (March 30, 1981). In particular, Cuisinarts relied on *United States v. Armco Steel Corp.*, 458 F.Supp. 784 (W.D. Mo.1978) ("*Armco Steel*"), which held, according to counsel for Cuisinarts, that a court lacks jurisdiction to rule on motions which are filed in connection with criminal actions which have previously been closed. Tr. 52. Since the criminal case, *United States of America v. Cuisinarts, Inc.*, had been closed on December 19, 1980—the date on which defendant had changed its plea and the court had imposed its sentence—counsel for Cuisinarts argued that the court lacked jurisdiction to hear the states' motion. Tr. 52, 54.

In *Armco Steel, supra*, a federal grand jury had been impaneled, and subsequently returned an indictment in the United States District Court for the Western District of Missouri. Later, a civil action based on similar allegations was brought in the United States District Court for the District of Kansas. Plaintiff in the Kansas civil action then moved, in the closed criminal action in the Western District of Missouri, for an order that the grand jury's documents be produced and disclosed.

In ruling on the motion for production of the grand jury materials, the court in *Armco Steel* held that, the criminal case having been concluded, it lacked jurisdiction to enter orders in connection with that action. The court stated that "[t]he proper method of bringing the instant controversy before the Court would have been the commencement of an independent proceeding in this district." *Armco Steel, supra*, 458 F.Supp. at 787. The court recognized, however, that all parties had previously appeared in the Western District of Missouri to argue the merits of the motion for disclosure of the grand jury materials. Accordingly, it simply ordered its Clerk to convert the pleadings into an independent proceeding, and to give that proceeding a civil docket number for purposes of the court's records. *Id.* at 788–789.

Thus *Armco Steel, supra*, holds only that a court may not rule on a motion which has been filed in connection with a closed criminal case. Nothing in that case suggests that, were the motion in the criminal action against Cuisinarts to be converted into an independent civil proceeding, this court would lack the jurisdiction to decide it. Moreover, no party to this proceeding, either in its papers or at oral argument, suggested either that the court lacked the power to convert the proceedings in that manner, or that, if the motion had been framed as an independent civil proceeding, the court would lack the jurisdiction to decide it.

At oral argument, it appeared that the substantive basis for Cuisinarts' challenge to the jurisdiction of the court was the concern of counsel that, if proceedings on the motion were to be conducted as part of the closed criminal case, Cuisinarts might be denied appellate review of an adverse decision. Tr. 55.[9] At the same time, counsel for Cuisinarts both conceded that any such problems of appellate review could be eliminated by restyling these proceedings as a civil action with a new caption, and consented to such a procedure. Tr. 56. Counsel for petitioners similarly consented to a refashioning of the proceedings. Tr. 84. Accordingly, in order to eliminate any possibility of the denial of appellate review, and with the consent of counsel for both petitioners and respondent, the court directed the Clerk of the Court to recaption the

---

**9.** Cuisinarts had first stated this argument in its memorandum in opposition to the motion of the state attorneys general, but it had not included an explicit challenge to the jurisdiction of the court in those papers. In particular, Cuisinarts had stated that if the court granted the states' motion, it would then seek certification, pursuant to 28 U.S.C. § 1292(b), of an interlocutory appeal. Because § 1292(b) applies only to *civil* actions, any decision issued in connection with the *criminal* action would not be appealable under that provision. For that reason, Cuisinarts argued, the court should decline to hear the motion. Memorandum of Cuisinarts, Inc. in Opposition to Motion by Attorneys General for Release of Grand Jury Documents 2–3 (filed Feb. 13, 1981).

proceeding as a civil action. Moreover, with the consent of all parties, the court stated that the papers filed by the parties would be deemed to have been filed in the separate civil action, a docket for which would be established by the Clerk. Tr. 93–94. Therefore, the proceedings to be held in connection with the Motion to Inspect and Copy Grand Jury Materials, originally filed by the state attorneys general as part of the closed criminal case, are henceforth to be known as *In Re Grand Jury Investigation of Cuisinarts, Inc.*, Civil No. H 81–224.

*The Merits of Petitioners' Motion*

■ Petitioners bring their motion pursuant to Rule 6(e), Fed.R.Crim.P., and Section 4F(b) of the Clayton Act, 15 U.S.C. § 15f(b). Rule 6(e)(2), Fed.R.Crim.P., codifies the "general rule" that "matters occurring before the grand jury" shall "not [be] disclose[d]". Rule 6(e)(3) then enumerates several exceptions to the general rule. In particular, Rule 6(e)(3)(C)(i), on which petitioners rely, permits disclosure of matters occurring before the grand jury "when so directed by a court preliminarily to or in connection with a judicial proceeding[.]" As interpreted by the Supreme Court, however, this exception may properly be invoked only when the party seeking disclosure can show that the need for the grand jury material outweighs the interests in secrecy. In short, the moving party must show a "compelling necessity" for breaking the "indispensable secrecy of grand jury proceedings" and that need "must be shown with particularity." *United States v. Procter & Gamble Co.* ("*Procter & Gamble*"), 356 U.S. 677, 682, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958); *see also Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400, 79 S.Ct. 1237, 1241, 3 L.Ed.2d 1323 (1959); *Dennis v. United States*, 384 U.S. 855, 869–870, 86 S.Ct. 1840, 1848–1849, 16 L.Ed.2d 973 (1966); *Douglas Oil, supra*, 441 U.S. at 220–222, 99 S.Ct. at 1673–1674.

■ The question before the court, which is apparently one of first impression in this Circuit, concerns the relationship between Rule 6(e) and the recently-enacted Section 4F(b) of the Clayton Act, 15 U.S.C. § 15f(b).

Section 4F(a) of the Clayton Act, 15 U.S.C. § 15f(a), enacted at the same time as Section 4F(b), provides that whenever the federal government has brought an action under the antitrust laws, and the Attorney General of the United States has reason to believe that a state attorney general would be entitled to bring an action based on substantially the same alleged violation of the antitrust laws, he shall promptly give written notification to the states of that fact. Section 4F(b) then provides, in full, as follows:

> To assist a State attorney general in evaluating the notice or in bringing any action under sections 12 to 27 of this title, the Attorney General of the United States shall, upon request by such State attorney general, make available to him, to the extent permitted by law, any investigative files or other materials which are or may be relevant or material to the actual or potential cause of action under sections 12 to 27 of this title.

In their memoranda and at oral argument, the state attorneys general asserted several propositions: first, that the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("Hart-Scott-Rodino"), which amended the Clayton Act to include Section 4F(b), was intended to increase the involvement of state officials in the enforcement of federal antitrust laws; second, that grand jury documents are among the materials intended by Section 4F(b), to be disclosed; and third, that Section 4F(b) eliminates, for state attorneys general acting pursuant to the Clayton Act, the traditional requirement that a litigant seeking access to grand jury materials must show a compelling and particularized need for those materials.

Having reviewed the legislative history of Hart-Scott-Rodino, the court concludes that, as a general matter, the statute sweeps less broadly, and thus elevates the state role in antitrust enforcement to a lesser extent, than the petitioners assert. By authorizing states to bring civil antitrust actions, as *parens patriae*, Hart-Scott-Rodino does create a place for state govern-

ments in the enforcement of federal antitrust laws. Those *parens patriae* actions were intended, however, to fill only a narrow gap in the prior scheme of enforcement. The draftsmen of Hart-Scott-Rodino noted two technical problems which limited the usefulness, and thus deterred the filing, of private consumer class actions. The first problem was the difficulty, under Rule 23, Fed.R.Civ.P., of gaining class certification, *see* [1976] U.S.Code Cong. & Ad.News 2572, 2576–2577; the second was the difficulty of "managing" such an action, once a class has been certified, *id.* at 2583–2584.[10] Hart-Scott-Rodino attempts to solve both problems.

The concept of a *parens patriae* suit had long been known at common law. In the United States, it had evolved into a means by which a state could "sue in its quasi-sovereign capacity on behalf of its citizens to prevent interference with the flow of goods or natural resources" into the state or "to prevent acts of pollution." Kintner, Griffin & Goldston, *The Hart-Scott-Rodino Antitrust Improvements Act of 1976: An Analysis* (*"Hart-Scott-Rodino: An Analysis"*), 46 Geo.Wash.L.Rev. 1, 18–19 (1977). Although the *parens patriae* action was recognized to be the most efficient means of overcoming the obstacles to private class actions, judicial decisions in the early 1970's had limited the ability of states to bring such suits to remedy antitrust violations. *Hart-Scott-Rodino: An Analysis* 19; *see Hawaii v. Standard Oil Co.*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); *California v. Frito-Lay, Inc.*, 474 F.2d 774 (9th Cir.), *cert. denied*, 412 U.S. 908, 93 S.Ct. 2291, 36 L.Ed.2d 974 (1973). Reacting to these decisions, *see* [1976] U.S.Code Cong. & Ad.News 2577–2578, Congress, in Hart-Scott-Rodino, authorized the states to proceed as *parens patriae* in antitrust cases. Congress solved the problem created by Rule 23, Fed.R. Civ.P., simply by making clear that class certification would not be required in *par-*

ens patriae* actions, *see* 15 U.S.C. § 15c(a). It solved the chief problem in managing such actions by permitting damages to be computed through aggregation techniques, *see* 15 U.S.C. § 15d.

Discovery problems were not of apparent concern to the draftsmen of the *parens patriae* provisions. With respect to discovery issues, the draftsmen noted only that the individual consumer lacked the investigative resources to disclose a possible conspiracy in violation of the antitrust laws. *See* [1976] U.S.Code Cong. & Ad.News 2575–2576. The draftsmen clearly recognized that either a class action or a *parens patriae* action could solve this problem by putting the resources of the class or the state government to work in discovery. Thus the only apparent concern of the draftsmen with respect to discovery was that of overcoming the individual litigant's lack of financial resources. Significantly, the reports of the relevant Congressional committees never mention as a problem in antitrust enforcement any substantive limitations on discovery imposed by the Federal Rules of Civil Procedure or the Federal Rules of Criminal Procedure.

Thus Hart-Scott-Rodino is but "a *limited* legislative response to [a] perceived loophole in antitrust liability." *Hart-Scott-Rodino: An Analysis* 19–20 (emphasis supplied). It provides specific, carefully tailored solutions to technical problems of antitrust enforcement. There is no indication that its draftsmen ever regarded the existing rules of procedure concerning discovery as a problem in such enforcement, or that they intended to modify, no less contravene, the existing rules.

This conclusion is supported by the plain language of Section 4F(b). Assuming, without deciding, that the term "investigative files or other materials," includes grand

---

**10.** *See* Scher, *Emerging Issues Under the Antitrust Improvements Act of 1976* (*"Emerging Issues"*), 77 Colum.L.Rev. 679, 709 (1977) ("The most troublesome problem related to manageability of consumer class actions has

been the difficulty encountered in developing an efficient, but constitutionally sound, procedure for assessing and distributing treble damages to millions of class members").

jury documents and transcripts,[11] the disclosure of such grand jury materials under Section 4F(b) is nevertheless explicitly limited "to the extent permitted by law." No other provision of Hart-Scott-Rodino refers to the right of state attorneys general to obtain Justice Department investigative files or other materials. Thus, if the phrase "to the extent permitted by law" is to have any significance at all, it must refer to other, pre-existing rules concerning the disclosure of grand jury materials. Rule 6(e), Fed.R.Crim.P., supplies the existing rules concerning such disclosure, and it specifically limits the extent to which disclosure is permitted. Indeed, as interpreted by the Supreme Court, Rule 6(e) specifically prohibits the disclosure of grand jury documents, even for use in another judicial proceeding, except upon a showing of compelling and particularized need. *See Procter & Gamble, supra,* 356 U.S. at 682, 78 S.Ct. at 986; *Douglas Oil, supra,* 441 U.S. at 220–224, 99 S.Ct. at 1673–1675.

Petitioners find no limitations in Section 4F(b). Indeed, they contend that Hart-Scott-Rodino frees them from the requirements of Rule 6(e). Memorandum in Support of the Motion of the Commonwealth of Massachusetts and the States of Maine, New Hampshire, New Jersey, New York and Rhode Island to Inspect and Copy Grand Jury Materials ("Petitioners' Memorandum") 2–3 (filed Jan. 12, 1981). Petitioners can find no support, however, in the legislative history of Section 4F(b). As understood by the Senate manager of the legislation, Senator Abourezk, Section 4F(b) "specifically limits the Attorney General's power to release documents to whatever his powers are *under existing law.*" 122 Cong. Rec. 29160 (1976) (emphasis supplied).[12]

---

**11.** The parties vigorously disagree in their interpretations of the phrase "investigative files or other materials." Petitioners rely on *United States v. Colonial Chevrolet Corp.,* 629 F.2d 943, 946–947 (4th Cir. 1980), to argue that Congress intended the term "investigative files" to include grand jury materials and transcripts. *See* Memorandum in Support of the Motion of the Commonwealth of Massachusetts and the States of Maine, New Hampshire, New Jersey, New York and Rhode Island to Inspect and Copy Grand Jury Materials ("Petitioners' Memorandum") 7–8 (filed Jan. 12, 1981). Respondent Cuisinarts relies on *Matter of Grand Jury,* 469 F.Supp. 666, 671 (M.D.Pa.1978), which states, without additional discussion, ". . . we do not read 'investigative files or other materials' as including grand jury materials . . . ." *See* Memorandum of Cuisinarts, Inc. in Opposition to Motion by Attorneys General for Release of Grand Jury Documents 16–17 (filed Feb. 13, 1981).

The court has concluded that, even if this disputed phrase sweeps as broadly as petitioners assert, the other provisions of Section 4F(b)—and, in particular, the term "to the extent permitted by law"—impose on petitioners a burden of showing a compelling and particularized need for the grand jury materials. The court has further concluded that, in the circumstances of this litigation, petitioners have been unable to meet that burden. Accordingly, it is not necessary for the court to analyze, with specificity, the phrase "investigative files or other materials," or to resolve this particular dispute between the parties.

Although the court shall not attempt to resolve this dispute, one point must be made concerning the meaning of the phrase "investigative files and other materials." Relying on *United States v. Colonial Chevrolet,* 629 F.2d 943, 946–947 (4th Cir. 1980), petitioners suggest that grand jury documents are part of the Justice Department's "investigative files" simply because those documents are in the Justice Department's possession. Petitioners' Memorandum 7–8. Petitioners forget, however, that a federal grand jury is an arm of the District Court, and thus of the judiciary, and not an agent of the Justice Department or of any other executive agency. It is the District Court which impanels, supervises, and discharges the grand jury. *See Procter & Gamble, supra,* 356 U.S. at 684–685, 78 S.Ct. at 987–988 (Whittaker, J., concurring) ("[G]rand jury minutes and transcripts are not the property of the Government's attorneys, agents or investigators . . . . Instead those documents are records of the court"). *See also State of Illinois v. Widmar,* [1980–81] Trade Cases (CCH) ¶ 63,771 (N.D.Ill. 1981) (Because grand jury materials are the property of the judicial branch, Section 4F(b) "applies only and exclusively to the investigative files and other materials acquired by and belonging to the executive branch, of which the Department of Justice is a member." Accordingly, "Section 4F(b) does not refer to what is strictly thought of as grand jury materials").

**12.** As floor manager of Hart-Scott-Rodino on behalf of the Senate Judiciary Committee, *see United States v. Colonial Chevrolet, supra,* 629 F.2d at 947, Senator Abourezk was uniquely qualified to interpret the various provisions of the statute. The remarks which he made in the course of floor debate provide insight into the

Under the existing law of Rule 6(e), the Attorney General could release grand jury documents only upon a showing before the District Court of compelling and particularized need. As Senator Abourezk put it, "Under existing law, [the Attorney General] cannot turn over materials given in response to a grand jury demand or to a civil investigative demand." 122 Cong.Rec. 29160 (1976). According to the House Committee Report on Section 4F(b), the phrase "to the extent permitted by law," means that "the files are to be made available except where specifically prohibited." [1976] U.S.Code Cong. & Ad.News 2586. Again, Rule 6(e), Fed.R.Crim.P., as construed by the Supreme Court, imposed such specific prohibitions well before the adoption of Hart-Scott-Rodino (as it still does). *See Procter & Gamble, supra.*

Thus the legislative history of Section 4F(b) refutes petitioners' argument. In fact, based upon an exhaustive review of the record, the leading commentators on the legislative history of Hart-Scott-Rodino have concluded that, under Sections 4F(a) and 4F(b), the United States Attorney General is required

> to notify state attorneys general of Sherman Act violations that have potential as parens patriae actions and to provide them with investigative files and other materials, *except for materials obtained through grand jury proceedings or CID's [Civil Investigative Demands], which may not be provided.*

*Hart-Scott-Rodino: An Analysis* 30 (citations omitted; emphasis supplied).[13] Indeed, the commentators also conclude that

> For example, in the typical big antitrust case, such as the IBM monopoly case, literally millions of documents may be relevant or material to an antitrust cause of action. The Justice Department could thus become a massive document distribution center for the benefit of State officials and of the enterprising private antitrust attorneys interested in developing a parens patriae lawsuit out of the Justice Department's investigative files.

> \*   \*   \*   \*   \*   \*

> MR. ABOUREZK: Also, Senator Hruska has raised objection to Section 4F(b) of the Byrd motion . . . . [Text of Section 4F(b) omitted]. This section specifically limits the Attorney General's power to release documents to whatever his powers are under existing law. Under existing law, he cannot turn over materials given in response to a grand jury demand or to a civil investigative demand. Therefore, the section is limited by existing law to cases where materials were turned over voluntarily. This section is in the bill because it was requested by the members of the House conferees [sic] who had met on this.

122 Cong.Rec. 29144, 29160 (1976). Senator Abourezk provided an authoritative Senate view of the provision proposed by the House. The intention of the legislators most closely connected to this provision was not in any sense "equivocal." *See* page 1020, *infra; contra, United States v. B. F. Goodrich Co.,* 619 F.2d 798, 800 (9th Cir. 1980).

meaning of Section 4F(b), which was proposed by the House and described in the House Committee Report which is reprinted in [1976] U.S. Code Cong. & Ad.News at 2586. Senator Abourezk's remarks were made in response to the plausible argument by Senator Hruska that Section 4F(b) could turn the Department of Justice into a "massive document distribution center." *See* 122 Cong.Rec. 29144 (1976). The contrast between Senator Hruska's critique, *id.*, and Senator Abourezk's response, *see* 122 Cong.Rec. 29160 (1976), suggests that the aims of Section 4F(b) are much less sweeping than petitioners assert. (Note that Section 4G of Hart-Scott-Rodino, 15 U.S.C. § 15g, permits state governments to retain private attorneys to bring *parens patriae* actions).

MR. HRUSKA: I will point the Senator to two other changes to facilitate large recoveries and private attorney's fees.

First, newly added Section 4F(b), which was not part of the Senate bill passed on June 10 [1976,] authorizes state officials and retained private attorneys to request "any investigative files or other materials which are or may be relevant or material to the actual or potential cause of action" available to a State, whenever the Attorney General of the United States has brought an antitrust action which may affect the States.

For example, in large antitrust cases charging nationwide activities by national corporations, all affected States would be notified by the Department of Justice.

Under this new provision, State officials and retained private attorneys would be entitled to demand truckloads of investigative materials, which conceivably might be relevant not only to an actual but even to a "potential cause of action."

**13.** In the Antitrust Civil Process Act of 1962 ("1962 Act"), 15 U.S.C. §§ 1311–1314, Congress had authorized the Justice Department to issue civil investigative demands ("CID's") as part of its investigations of possible antitrust violations. Pursuant to such CID's, Justice Depart-

when the Justice Department argues, as it did in this proceeding, Tr. 12–14, 16–17, that a state may gain access to grand jury testimony under Section 4F(b), it adopts a

ment investigators were permitted to acquire documentary material relating to those investigations. The 1962 Act included, however, extensive guidelines for preserving the confidentiality of those materials. See 15 U.S.C. § 1313 (1962). In 1976, Hart-Scott-Rodino amended the 1962 Act to permit (1) the issuance of CID's to third-parties, as well as to persons suspected of antitrust violations, see 15 U.S.C. § 1312(a), as amended (1976), and (2) the submission of written interrogatories by, and the taking of oral depositions from, persons to whom CID's have been issued, id.

Hart-Scott-Rodino in no way modified the procedures of the 1962 Act for preserving the confidentiality of CID materials. Indeed, Hart-Scott-Rodino extended those procedures to protect the kinds of oral and written materials which it was, in other provisions, authorizing the Justice Department to collect. Thus under federal antitrust law, as it existed before Hart-Scott-Rodino and as it now exists, the Justice Department bears a duty to maintain the confidentiality of CID materials. The Assistant Attorney General in charge of the Antitrust Division is required to designate an antitrust investigator to serve as "custodian of documentary material, answers to interrogatories, and transcripts of oral testimony," 15 U.S.C. § 1313(a). The custodian is to "take physical possession" of the CID material, 15 U.S.C. § 1313(c)(1), and while it is "in the possession of the custodian, no ... material ... so produced shall be available for examination, without the consent of the person who produced such material ... and, in the case of any product of discovery produced pursuant to an express demand for such material, of the person from whom the discovery was obtained, by any individual other than a duly authorized official, employee, or agent of the Department of Justice," 15 U.S.C. § 1313(c)(3). The custodian may provide the CID materials to a Justice Department attorney for use "before any court, grand jury, or Federal administrative or regulatory agency in any case or proceeding," 15 U.S.C. § 1313(d)(1). "Upon the completion of any such case, grand jury, or proceeding," however, "such attorney shall return to the custodian any such material, answers or transcripts so delivered which have not passed into the control of such court, grand jury, or agency, through the introduction thereof into the record of such case or proceeding," id. (emphasis supplied). After the completion of any case or proceeding arising from the investigation for which the CID material had been produced, or after the passing of a reasonable period of time in which no case or proceeding has been commenced, the custodian is required, upon written request of the person who produced the material, to return the material to that person. See 15 U.S.C. § 1313(e). There are only two limitations on this require-

ment. First, the Justice Department may make copies of the CID documents. See 15 U.S.C. § 1313(c)(2). Second, the custodian may return only that material "which has not passed into the control of any court, grand jury or agency through the introduction thereof into the record of such case or proceeding," 15 U.S.C. § 1313(e).

An analysis of these provisions, and especially of 15 U.S.C. § 1313(d)–(e), provides a further basis for rejecting petitioners' interpretation of Section 4F(b). To begin, it is clear that CID materials that are not put before a grand jury are not subject to disclosure requests by state attorneys general. Section 1313(c) so provides. The Justice Department so stated at oral argument. Tr. 9. The commentators concur. See Emerging Issues 692 ("The absolute nature of the confidentiality protection afforded under [§ 1313] should operate to limit the scope of [S]ection 4F(b) .... Although [§ 1313(d)(1)] does permit use of CID material in connection with court proceedings, this applies only if 'any attorney of the Department of Justice has been designated to appear' before the court, and thus does not include a state attorney general engaged in a parens patriae investigation or suit"). This fact, alone, suggests that Congress did not intend that grand jury materials be released. In both the 1962 Act and Hart-Scott-Rodino, Congress made clear that the investigative materials collected by the Justice Department should remain confidential. Petitioners offer no principled basis for believing that grand jury materials should be treated with less of a concern for confidentiality than is required for CID's. In the relevant statutory provisions, Congress never indicates any intention of treating grand jury materials with a lower degree of confidentiality. Indeed, the fact that Congress did not establish specific guidelines for the secrecy of grand jury materials may have resulted from its belief that the pre-existing Rule 6(e), Fed.R.Crim.P., had settled that issue of law sufficiently. Thus the legislative scheme which Congress created to protect CID materials from disclosure suggests how Congress intended that grand jury materials be preserved.

In the present case, however, much of the CID material which had been collected by the Justice Department was also introduced before the grand jury. At oral argument, the Justice Department represented that it had acquired no more than 50,000 documents as a result of its investigation of Cuisinarts. Tr. 7. Of these, approximately 26,000 documents had been produced by Cuisinarts pursuant to grand jury subpoenas. Tr. 6–7. At the same time, the Justice Department represented that there was "substantial overlap" between those documents which had been produced pursuant to

view which is "in conflict with the legislative history[.]" *Hart-Scott-Rodino: An Analysis* 30 n.193.

In their memoranda, the state attorneys general argue that "even before the enactment of Section 4F(b), the courts recognized that governmental agencies, including those which are not specifically charged with enforcing the antitrust laws, should be accorded a special status and given access to grand jury materials without a showing of 'particularized need.'" *See, e.g.,* Petitioners' Memorandum 9. Thus petitioners seem to suggest that even if the court were to disagree with their interpretation of Section 4F(b), they are relieved of the obligation to show a particularized need for the grand jury materials simply because they are "governmental agencies."

Having reviewed the authorities which petitioners have cited in support of that argument, as well as other applicable principles of law, the court finds no basis for reaching the conclusion which petitioners propose. Indeed, in *United States v. Sobotka,* 623 F.2d 764 (2d Cir. 1980), our Court of Appeals reversed a District Court's order that transcripts of grand jury testimony be disclosed to the Grievance Committee of the Windham County Judicial District, State of Connecticut, an entity which, the court found, was "an independent public body

charged with the performance of a public duty in a wholly disinterested and impartial manner." *Id.* at 767, *quoting Grievance Committee of Hartford County Bar v. Broder,* 152 A. 292, 296, 112 Conn. 263 (Sup.Ct. Conn.1930). Despite the Committee's public character and public duty, and the public interest in its work, the court required that the Committee establish a particularized need for the grand jury materials. *Id.* at 768. Finding that the Committee had made "no showing of particularized need," the court denied the Committee's request for the grand jury transcripts. *Id.*

This court finds, in sum, that Section 4F(b) was not intended to contravene the existing law governing the disclosure of grand jury materials. The court recognizes, however, the division of authorities on this question. In particular, the courts of appeals for the Fourth and Ninth Circuits have both ruled that Section 4F(b) does eliminate the "compelling necessity" requirement when state attorneys general are seeking disclosure of federal grand jury files. *See United States v. Colonial Chevrolet Corp.,* 629 F.2d 943 (4th Cir. 1980) ("*Colonial Chevrolet*"), and *United States v. B. F. Goodrich Co.,* 619 F.2d 798 (9th Cir. 1980) ("*B. F. Goodrich*"). It must be noted, however, that in *B. F. Goodrich,* on which the Fourth Circuit subsequently relied in *Colo-*

CID's and those which had been produced pursuant to grand jury subpoenas. Tr. 8–9. It would appear that those documents which were first produced pursuant to a CID and later presented to the grand jury are subject to the strict confidentiality requirements of 15 U.S.C. § 1313, and thus, under § 1313(c), are available to Justice Department personnel only. Because a "substantial" number of the grand jury documents which the states now seek were, in fact, first produced pursuant to a CID, the states' disclosure request would appear to be barred, to that extent, by the terms of 15 U.S.C. § 1313.

It might be argued that a CID document loses its protections under § 1313 once it is produced to a grand jury. *See, e.g.,* Tr. 9–15 (oral argument of attorney for United States). Such an argument would have to be rejected, however, for two reasons. First, even if the protections of § 1313 were removed as soon as the material had been produced to the grand jury, the protections of Rule 6(e), Fed.R.Crim.P., which are at least as stringent, would attach to

those materials at the moment that they first came before the grand jury. Second, in both §§ 1313(d) and 1313(e), Congress recognized the well-settled principle that materials introduced to the grand jury enter the control, and become part of the record, of the court. *See Proctor & Gamble, supra,* 356 U.S. at 684–685, 78 S.Ct. at 987–988 (Whittaker, J., concurring). Indeed, in § 1313(d)(1) Congress provided that material which has "passed into the control" of a grand jury, "through the introduction thereof into the record" of a proceeding, may not be returned to the Justice Department custodian. In § 1313(e), it provided that such grand jury material may not be returned to the person who produced it. Thus in § 1313, Congress appeared to place grand jury material outside the control of the Justice Department. If that is the case, there must be a serious question whether the Justice Department would have the power, under Section 4F(b), to provide the grand jury materials requested by the states. *Cf. State of Illinois v. Widmar,* [1980–81] Trade Cases (CCH) ¶ 63,771 (N.D.Ill.1981).

*nial Chevrolet, supra,* 629 F.2d at 947, 950, the Ninth Circuit found the legislative history of Section 4F(b) to be "equivocal," *B. F. Goodrich, supra,* 619 F.2d at 800, and concluded only that Section 4F(b) "impliedly directs" disclosure of grand jury materials, *id.* at 801.

This court respectfully disagrees with the notion that the legislative history of Section 4F(b) "impliedly directs" disclosure of grand jury materials. It finds in that history no congressional direction, either explicit or implicit, to contravene the pre-existing law concerning disclosure of grand jury materials. Nevertheless, even if this court were to concur in the Ninth Circuit's characterization of the legislative history of Hart-Scott-Rodino, it could not follow that court's holding. In view of the clear language of Section 4F(b), this court could not rely on a legislative history that is, at best, "equivocal," or a Congressional mandate that is, at most, "implied," to overturn a policy that is as well-settled as that of grand jury secrecy. *See Pittsburgh Plate Glass Co. v. United States,* 360 U.S. 395, 399, 79 S.Ct. 1237, 1240, 3 L.Ed.2d 1323 (1959) (The policy of grand jury secrecy is "older than our Nation itself"); *In re Biaggi,* 478 F.2d 489, 491 (2d Cir. 1973) (Although a grand jury witness may waive the protection of secrecy, "[i]t is a tradition of our law that proceedings before a grand jury shall generally remain secret").[14]

Indeed, it is a well-settled principle of statutory construction, often stated by the Supreme Court, that a court may not rely on an ambiguous legislative history to contradict the plain language of a statute. *Consumer Product Safety Commission v. GTE Sylvania,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) ("[T]he starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive"). *See Aaron v. Securities and Exchange Commission,* 446 U.S. 680, 697, 100 S.Ct. 1945, 1955, 64 L.Ed.2d 611 (1980) (In view of the language of the statute there being construed, "it would take a very clear expression in the legislative history of congressional intent to the contrary to justify the conclusion that the statute does not mean what it so plainly seems to say"). The court shall follow this "familiar canon of statutory construction," and give effect to the straightforward language of Section 4F(b). *Consumer Product Safety Commission v. GTE Sylvania, supra,* 447 U.S. at 108, 100 S.Ct. at 2056.

In heeding the explicit language of Section 4F(b), this court therefore adopts the approach followed by other district courts which, both before and after the Fourth and Ninth Circuits' opinions, have held that Hart-Scott-Rodino does not relieve state attorneys general of the burden of demonstrating a compelling and particularized necessity for any grand jury materials they seek. *See State of Illinois v. Widmar,* [1980–81] Trade Cases (CCH) ¶ 63,771 (N.D. Ill.1981); *Little Rock School District v. Borden, Inc.,* [1979–2] Trade Cases (CCH) ¶ 62,809 (E.D.Ark.1979); *Matter of Grand Jury,* 469 F.Supp. 666 (M.D.Pa.1978). *Contra, United States v. Cargo Gasoline Co.,* slip op. No. 79–124–Cr–JB (M.D.Fla. Jan. 29, 1981); *In Re Montgomery Real Estate Antitrust Litigation,* 452 F.Supp. 54 (D.Md. 1978).

■ Accordingly, this court shall require that the state attorneys general establish a compelling and particularized need for the grand jury materials they seek. The question is whether they have met that burden.

---

**14.** In *In re Biaggi,* 478 F.2d 489, 491 (2d Cir. 1973), our Court of Appeals summarized some of the policy considerations which underlie this tradition of grand jury secrecy.

The tradition rests on a number of interests—the interest of the government against disclosure of its investigation of crime which may forewarn the intended objects of its inquiry or inhibit future witnesses from speaking freely; the interest of a witness against the disclosure of testimony of others which he has had no opportunity to cross-examine or rebut, or of his own testimony on matters which may be irrelevant or where he may have been subjected to prosecutorial browbeating without the protection of counsel; the similar interests of other persons who may have been unfavorably mentioned by grand jury witnesses or in questions of the prosecutor; protection of witnesses against reprisal; and the interests and protection of the grand jurors themselves.

In *Douglas Oil, supra,* 441 U.S. at 222, 99 S.Ct. at 1674, the Supreme Court set out a three-part test for determining when the traditional secrecy of the grand jury may be broken. The Court stated as follows:

> Parties seeking grand jury transcripts under Rule 6(e) must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed.

Since the state attorneys general have not even attempted in their memoranda to establish either a compelling or a particularized need for the grand jury material, only a few points by the court are required. Two of the petitioning states—Massachusetts and New Jersey—are already involved in the consolidated pre-trial proceedings of *In Re Cuisinart Food Processor Antitrust Litigation.* Other petitioning parties may become so involved. There is no reason to believe that denial of the grand jury material in the course of this independent civil proceeding will, in any way, cause them injustice in the other pending civil actions. The petitioners are free to seek, in the consolidated litigation and under the Federal Rules of Civil Procedure, the same grand jury material which they now claim under Rule 6(e), Fed.R.Crim.P., and Hart-Scott-Rodino. They are free to use the Federal Rules of Civil Procedure for all other appropriate and lawful discovery purposes. Thus a denial of access to the grand jury material in this proceeding does not necessarily eliminate the ability of those states to pursue the same material, or substantially similar evidence, by other means.

With respect to the second part of the Supreme Court's test, there is substantial authority for the proposition that the public interest in secrecy is reduced, although not eliminated, once the criminal proceedings generated by the grand jury have been concluded. *See Douglas Oil, supra,* 441 U.S. at 222, 99 S.Ct. at 1674.[15] This court considers it to be equally true, however, that when the same or substantially similar materials are available by other means, and when the consumer protection aims of Hart-Scott-Rodino are being pursued by the litigation of seven pending national consumer class actions, the states' need for disclosure is similarly reduced. *See United States v. Moten,* 582 F.2d 654, 663 (2d Cir. 1978) (A party's "need" for grand jury materials varies in proportion to the degree of access he has to other sources of the information he seeks). Accordingly, this court cannot conclude that the states' need for disclosure, at this time and in this action, outweighs even the presently reduced public interest in the secrecy of the grand jury proceedings.

Finally, the states have not attempted to particularize their disclosure requests in any way. Because they do not know precisely what evidence the grand jury received, they are, of course, limited in their ability to specify relevant materials. Nevertheless, they have indicated no willingness to tailor their requests according to either time or geographic location. Indeed, the essence of petitioners' argument is that Section 4F(b) relieves them from having to tailor their requests in any significant way. In the absence of even a suggestion, either in their memoranda or at oral argument, as to a procedure for the court's determining whether the minimal relevance requirements of Section 4F(b) have been met, this court cannot conclude that the states' re-

---

**15.** In *United States v. Sobotka,* 623 F.2d 764 (2d Cir. 1980), our Court of Appeals drew on *Douglas Oil, supra,* 441 U.S. at 222–223, 99 S.Ct. at 1674–1675, to hold that, where grand jury proceedings had been concluded and where the party seeking disclosure of the grand jury's documents was a public body, the burden on that party of showing a compelling necessity for the documents was reduced. *United States v. Sobotka, supra,* 623 F.2d at 767. "Nonetheless," the court stated, "some necessity need be shown by the party seeking disclosure." *Id.* In particular, the court held that "the showing of need must be made 'with particularity' so that 'the secrecy of the proceedings [may be] lifted discretely and limitedly.'" *Id.* at 768, *quoting United States v. Procter & Gamble Co.,* 356 U.S. 677, 682–683, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958). It is precisely such a showing of particularized need which the petitioners in this proceeding have declined to attempt.

quest has been particularized sufficiently to satisfy the rule of *Douglas Oil, supra.*[16]

Having applied the principles of *Douglas Oil, supra,* to the circumstances of this case, the court concludes that the petitioners have failed, to this point, to make a showing of need—and, especially, of a particularized need—sufficient to warrant disclosure. The motion by the state attorneys general is, therefore, denied.[17]

In conclusion, the court must make two points. First, as the court indicated at the outset, the motion of the state attorneys general, and the court's ruling on it, are but a piece of a large and complex litigation. In ruling on the motion, the court has considered only one, relatively narrow, issue of law—namely, whether Hart-Scott-Rodino, read in conjunction with Rule 6(e), Fed.R. Crim.P., compels disclosure of the materials which the grand jury compiled in the course of its investigation of Cuisinarts. The court and all counsel know that these grand jury materials are also the subject of discovery requests, made pursuant to the Federal

---

**16.** In their memoranda, petitioners specifically contend that they are not required either to particularize their need for grand jury materials or to narrow the scope of their request. *See, e.g.,* Petitioners' Memorandum 11. At oral argument, petitioners similarly refused to particularize their request for the grand jury documents. The following colloquy between the court and counsel for petitioners illustrates petitioners' position.

> THE COURT: Let me ask you whether your argument isn't something like a bootstrap argument; namely, that if the Grand Jury received something in evidence, if the Grand Jury had it, it must be relevant to every state's possible claim; isn't that really what you are saying?
> Isn't your claim here really that if the Grand Jury had it, it's relevant, it's got to be relevant; that's why you want it all?
> MR. KOVACS: I think that absent knowledge about what was produced to the Grand Jury, it's a very difficult question to answer. Documents might be subpoenaed that, in fact, might not have relationship to an unlawful antitrust violation. For instance, financials—
> THE COURT: Hold on a second.
> So you wouldn't be able to answer the question of relevance, you're saying, until, in effect, you've gotten it all? You can't make a judgment about relevance?
> MR. KOVACS: That's correct. An example would be—
> THE COURT: So, in fact, your argument is that in all cases of this sort, the parens patriae litigants really are entitled to everything?
> MR. KOVACS: That's correct.
> THE COURT: Without a showing of relevance at the threshold? Inasmuch as—
> MR. KOVACS: I think what we would argue is that there must be a presumption of relevance attached as a result of the fact that the subpoena for those documents was issued, so that some attorney, and with supervision by the appropriate authorities in the Department of Justice, made a decision that those documents requested and that testimony tak-

en bore some relevance to the alleged violation.
> THE COURT: So that's the argument that I suggested: If the Grand Jury had it, it's relevant?
> MR. KOVACS: I think correct, yes; that is correct.
> On the other hand, however, I know in our investigations we might ask for a balance sheet. While that might not be relevant to the evidence of the unlawful agreement, it might be relevant to damages. But I think it goes farther out, as far as its relevance is concerned.

Tr. 44–46.

**17.** There is some authority for holding that the policy of grand jury secrecy has a more limited application to subpoenaed documents than it does *to transcripts of grand jury testimony and proceedings. See, e.g., State of Illinois v. Sarbaugh,* 552 F.2d 768, 772 n.2 (7th Cir. 1977), *cert. denied sub nom. J.L. Simmons Co. v. Illinois,* 434 U.S. 889, 98 S.Ct. 262, 54 L.Ed.2d 174 (1977), *citing United States v. Interstate Dress Carriers, Inc.,* 280 F.2d 52, 54 (2d Cir. 1960). At oral argument, counsel for both *the United States and for respondent Cuisinarts* argued that the court should give identical treatment to subpoenaed documents and to transcripts of proceedings. Tr. 11, 57. (They disagreed, however, on the question of what sort of treatment that should be). Similarly, petitioners have never urged that the court adopt a distinction between subpoenaed documents and grand jury transcripts. Having considered the views of counsel, and having reviewed the case law concerning grand jury secrecy, the court has found no convincing reason to apply different standards, or to accord different treatment, to subpoenaed documents and to transcripts of grand jury proceedings in this case. *See Matter of Grand Jury,* 469 F.Supp. 666, 671 (M.D.Pa.1978). In view of the court's denial of petitioners' motion, therefore, the petitioners shall not, at this time, be entitled either to documents subpoenaed by the grand jury, or to transcripts of proceedings conducted by the grand jury.

Rules of Civil Procedure, in the consolidated cases now pending before this court. In issuing this ruling, the court intimates no view concerning the discoverability of these grand jury materials pursuant to the Federal Rules of Civil Procedure. That is a separate issue that will be decided in due course.

Second, in denying disclosure of the grand jury materials, the court has held only that, until this point, the states have failed to make the requisite showing of a compelling and particularized need. The court recognizes, however, that as litigation proceeds, there may eventually be a basis for such a showing. Accordingly, this ruling is without prejudice to a renewed application for disclosure upon a showing of compelling and particularized need. So as not to render any such future application futile, the Attorney General of the United States is directed to retain, until further order of this court, all materials which were subpoenaed or created by the grand jury in the course of its investigation of Cuisinarts.

It is so ordered.