JOINER, Judge.
Ricky Russell Marshall was convicted of discharging a firearm into an occupied building, a violation of § 13A-ll-61(b), Ala.Code 1975, and attempted murder, a violation of §§ 13A-4-2 and 13A-6-2, Ala. Code 1975. The circuit court sentenced Marshall to 16 years’ imprisonment on the discharging-a-firearm-into-an-occupied-building conviction, and to 20 years’ imprisonment on the attempted-murder conviction.[1] Additionally, the circuit court ordered Marshall to pay a $50 crime victims compensation assessment on each count and court costs. Marshall filed a motion for a new trial, which was denied. This appeal followed.
Because Marshall does not challenge the sufficiency of the evidence, a brief recitation of the facts will suffice. Marshall and Virginia Cook are divorced and have one child (“Marshall’s child”). After her divorce from Marshall, Virginia married Billy Cook, and the couple lived in a home in Vance, with their two children and Marshall’s child. In February 2006, Marshall telephoned Cook’s house and left messages on Cook’s answering machine telling Cook to “look out” and “I’m coming.” On February 24, 2006, at approximately 10:30 p.m., Cook was in the living room of his house watching the news while the rest of the family was in their rooms asleep. As Cook watched the news, he heard a vehicle stop in front of his house. Cook walked to the front door to see why the vehicle had stopped, and he saw Marshall walking up to the door with a gun. Cook then closed the door, knelt down against the door, and tried to prevent Marshall from coming inside the home. Marshall fired approximately seven rounds through the door and into the house. Cook yelled for Virginia to telephone the police and to “get the shotgun” — even though Cook did not own a shotgun. Marshall then left.
Marshall testified that on February 15, 2006, he contacted the Department of Human Resources (“DHR”) and reported that Cook was abusing Marshall’s child. Marshall claimed that on February 24, 2006, he worked until approximately 2:00 a.m. and then a friend drove him home because his vehicle was inoperable at the time.
On appeal, Marshall contends that the circuit court erred when it denied him access to records held by the Tuscaloosa *197 County DHR, because, he says, it violated his “Sixth Amendment due process rights by limiting [his] right to confront and cross-examine his accusers.” (Marshall’s brief, p. 9.)
The record indicates that, before trial, Marshall issued a subpoena to the Tuscaloosa County DHR requesting “any and all documents and records as they pertain to [Marshall’s child].” DHR subsequently moved for a protective order requesting that the circuit court quash Marshall’s subpoena or, in the alternative, conduct an in camera inspection of the requested DHR documents to determine whether those records contained evidence material to the case. The circuit court subsequently denied the motion to quash but granted the protective order and conducted an in camera inspection of the requested documents.
Before trial the following exchange occurred:
“[The Court]: .... [W]hat is it that you’re seeking to get from the DHR file, because that helps me narrow down as to whether I order them to produce something or not.
“[Marshall’s counsel]: Ultimately, what I’m looking for is the report by [Marshall] that he made to DHR about [Cook] on February [15, 2006].”
(R. 26-27.)
Later, the court stated:
“Now, I have a packet of DHR records that was brought to me just moments ago, and I’m going to be looking through that as we go through the opening statements to try to expedite the request of [Marshall]. Specifically, there was allegedly information from on or about February 15, 2006, that [Marshall] is seeking to discover in that material. I will try to identify that quickly, if possible, and then give some indication of whether it’s going to be produced or not.
“Now, I don’t know the case, obviously, so even if I did not produce the document I’m not necessarily saying the information is not admissible under some other theory, so don’t hesitate to correct me if I make too broad a ruling in the case, because I’m trying to say I need to rule on whether or not the DHR record in and of itself gets produced to the defense. That may or may not be indicative of whether or not [Marshall] could introduce other information regarding some reports, if that became pertinent in the case.”
(R. 130-31.) After the circuit court reviewed the DHR documents, the following exchange occurred:
“[The Court]: While we are outside the presence of the jury, let me say that I have reviewed the documents that came to me from the Department of Human Resources.
[[Image here]]
“And I reviewed each page.
“I guess the question I need to ask again is what would the Defense want from the packet? And I say that because, again, I have an obligation not to turn over sensitive, confidential Department of Human Resource documents. It certainly would be easier to do so, but that’s not consistent with my obligation and duty.
“I think I’m familiar enough with what’s in there. Just to make a more informed ruling, you mentioned yesterday that what you were looking for was a report made by [Marshall] to [DHR] on or about, if I recall, February 14th or 15th of 2006, something in that range there.
“[Marshall’s counsel]: Correct.
“[The Court]: And I will say, certainly there is such an indication in the materi *198 al by the Department of Human Resources. The question that I have, I guess, is: The fact that a report was made, as I understood our discussions yesterday about potentially why the Defense would want to introduce that, would be for credibility of the alleged victim in the case, that is to say, that the alleged victim — would be in retaliation for having filed something with DHR, made up this story, because the defense is it didn’t happen, right?
“[Marshall’s counsel]: Well, we’re not saying that the shots weren’t fired. What I’m saying is my client didn’t do it.
“[The Court]: Right. Excuse me. I beg your pardon. And that’s exactly right, and I don’t mean to — and I’m not meaning to limit any defense that’s going to be put on, either. I just have to articulate for the record and also from my own judgment as to what I would be producing, because I guess I am somewhat hesitant to turn over a DHR record that has lots of information in it that may need to be redacted in certain areas as opposed to simply an acknowledgment of the fact that such a report was made in the case.
“[Marshall’s counsel]: Well, there’s—
“[The Court]: So help me understand what I should make a ruling on in the case.
“[Marshall’s counsel]: Well, I believe his file is quite extensive and he has quite a history, but what we’re really looking for is that [Marshall’s child] left his home or left the residence of [Cook] and [Virginia] on or about December the 2nd, 2005. He wrote a letter alleging abuse by [Cook] and his wife Virginia, and I believe that got back to my client and my client went to DHR and reported that. And it’s my understanding it was, like you said, sometime around February the 15th.
“I am not interested in any of the records prior to December the 2nd, 2005. I think they’re quite extensive, and I’m probably aware of most of them. But I don’t think that those are pertinent to this case. I think what’s pertinent is the report of the abuse by [Cook] and Virginia to [Marshall’s child].
[[Image here]]
“[The Court]: Well, and I will just note for the record in an inch thick of documents, there’s certainly many things that we won’t get any — we’re not even going to come near introducing the DHR records in this case. The question becomes, though, is that the Defense wants to introduce the fact that [Marshall] made a complaint to DHR about [Marshall’s child] and that that complaint was known to [Cook]. What would be the—
[[Image here]]
“[The Court]: So is it the defendant’s — is it the defendant’s position or claim that [Cook]’s credibility is at issue because of the DHR — because he made this up because he had a DHR complaint filed against him?
[[Image here]]
“[Marshall’s counsel]: Yes, sir. Yes, sir.
“[The Court]: And I’m not saying that does anything other than helps me streamline my focus of what I need to make a ruling on. So we’ll close out the record and let you talk.
“(Off record.)
“[The Court]: Can I go back on the record for a moment? And you can stay seated. I’m just going to make sure I put my thought process on the record so that it can be corrected by you in a few moments or at least explained about what my thinking and rationale is about this issue.
*199 “We have a situation where the credibility of a witness is always for the jury to determine, and the evidence law encourages evidence to come in that goes to credibility only of a witness. And we know that the evidence law favors that and tends to encourage the introduction of evidence, if it’s available, that would go to credibility of witnesses. Once again, it’s not for the Court to make that judgment; it would be for the jury.
“So we have a situation where confidential records are delivered to the Court in response to a subpoena that are protected by various privileges — and rightly so — and I have to make a proper balancing analysis of whether or not any of those documents are produced to one side or the other, for a variety of reasons. One reason in particular is that you certainly want to encourage free exchange of information and free reporting of information to the Department of Human Resources, and it chills that or it thwarts that if we just turn over those records, because many allegations that are made prove to be substantiated. Many allegations are made that result in investigations being conducted, interviews being conducted with children, in particular, where the children have to be encouraged to speak freely and frankly and forthrightly with the interviewing parties. So, therefore, I have an absolute obligation to ensure that those documents are not later produced into proceedings that could thwart or chill that beneficial purpose of the privilege.
“Now, in this particular case, neither side would have access to these documents. Correct, [prosecutor]?
“[Prosecutor]: Yes, sir.
“[The Court]: Correct, [Marshall’s counsel]?
“[Marshall’s counsel]: Yes, sir.
“[The Court]: All right. So I have to balance the various interests involved with this observation: The witness [Cook] testified on cross-examination in response to this question, ‘Did DHR contact you on February 15th of 2006?’ The witness answered — and this is a rough transcription, by the way, in deference to the court reporter, who on very short notice has helped me prepare something.
“This may not — subject to her making sure this is exact, the witness said, ‘Not to my knowledge. I don’t have a recollection of it’ or words to that effect.
“.... And then the question again was, “You have no recollection of DHR calling you about [Marshall’s child] on February the 15th?’ ‘No, sir.’
“Now, I will say that there are documents in the DHR files that do not contradict that. Let me rephrase what I just said, because that’s a very inappropriate sentence. There are no documents in the DHR records that would prove that DHR contacted him on February 15th of 2006. Now, I’ll point out that I understood the witness’s testimony to be ‘not to my knowledge, not to my recollection,’ so I don’t know that you can say that was a denial of it. But I will say that there are no documents there that would show that DHR contacted him on February 15th, 2006 about [Marshall’s child], so I’ve found nothing that would indicate that to be the case.
“I will say that there are documents indicating that shortly thereafter he was contacted about [Marshall’s child] and about the allegations that [Marshall’s child] made. I don’t think that that’s the question asked, but in fairness to the Defense, the Defense would not know that. That is to say, you would not have access to the records or information there about the case.
*200 “So the reason that I’m making the observation in those terms is one approach to this would be to allow the Defense to have an interview that was conducted with [Cook] shortly after February 15th, 2006 — specifically, February 17th, 2006 — to refresh his recollection.
[[Image here]]
“I will also point out that I think I had an obligation to look through there to see if there was an inconsistent statement in the case. Now, I’ve not found that, so I’ll note that for the record. Because we often have to do that with witnesses in DHR records, particularly in child molestation cases or likewise, to find that there was an inconsistency. I have not seen that in the documents, and I’ll note that for the record.
“I’m just pointing out that I don’t think that there is any means by which the Defense could obtain information about whether or not DHR contacted [Cook] about the accusation made about abuse of [Marshall’s child] before the incident, that is to say, between February the 14th, 2006 — excuse me, February 15th, 2006 and February 24th, 2006, other than through having the DHR records produced. I will say that there [are] indications in the DHR records that [Cook] was contacted by DHR about the accusation made by [Marshall’s child] between February 15th, 2006, and February 24th 2006. I’m disclosing that, because I think the appropriate approach is to say there’s no other means by which the Defense could obtain the discovery of that information.
“Now, I’m not suggesting that’s admissible yet. I’m only pointing out that rather than giving anyone these documents, which I think would be inappropriate to do so, rather than giving even the witness a document to look at that could refresh recollection, which I think in the balancing analysis would be an inappropriate thing to do when compared to the privileges that should attach to this type of investigation of child issues — I think the appropriate approach for the Court to take is to say DHR records indicate that [Cook] was contacted on or about February 17th, 2006 and interviewed about the allegations allegedly made by [Marshall’s child] in the case. Now, that’s where I think I’m.going to end up with the documents.”
(R. 247-59.) After this discussion, Virginia testified and Marshall questioned her about DHR’s coming to her house between February 15, 2006, and February 24, 2006. Virginia admitted that DHR had visited the home and interviewed the family. After the State rested its case, Marshall called Cook to testify and questioned him about DHR’s coming to his house between February 15, 2006, and February 24, 2006. Cook stated that he recalled DHR’s coming to his house, but could not recall a specific date. Marshall took the witness stand and testified that he called DHR on February 15, 2006, and alleged that Cook was abusing Marshall’s child. Although the circuit court told the parties that DHR visited the Cooks’ house between February 15, 2006, and February 24, 2006, it did not allow Marshall to inspect the DHR records pertaining to that visit.
Section 26-14-8, Ala.Code 1975, provides a list of entities to which child-abuse- and-neglect records may be made available. Section 26-14-8 provides, in pertinent part:
“(c) The Department of Human Resources shall establish and enforce reasonable rules and regulations governing the custody, use, and preservation of the reports and records of child abuse and neglect. Child abuse and neglect reports and records shall be limited to the *201 purposes for which they are furnished and by the provisions of law under which they may be furnished. The reports and records of child abuse and neglect and related information or testimony shall be confidential, and shall not be used or disclosed for any purposes other than:
[[Image here]]
“(4) For use by a court where it finds that such information is necessary for the determination of an issue before the court;
[[Image here]]
“(f) Nothing in this section shall be construed as restricting the ability of a department to refuse to disclose identifying information concerning the individual initiating a report or complaint alleging suspected instances of child abuse or neglect, except that the department may not refuse such a disclosure in cases in which a court orders such disclosure after the court has reviewed, in camera, the record of the department related to the report or complaint and has determined that it had reason to believe that the person making the report knowingly made a false report.
“(g) Any person receiving reports or records of child abuse or neglect or related information under this section shall maintain the confidentiality of the documents and information and not disclose it except as authorized by law.
“(h) Any violation of the provision of confidentiality shall be a Class A misdemeanor.”
It is clear from the relevant portions of § 26-14-8, Ala.Code 1975, quoted above that the legislature’s intent was not only to establish a central registry for reporting instances of child abuse and neglect but also to provide for the confidentiality of those records. See Jordan v. State, 607 So.2d 383, 336-37 (Ala.Crim.App.1992) (recognizing that the primary goal of § 26-14-8, which establishes a central registry for DHR for reporting child abuse, is to provide for confidentiality). The circuit court’s in camera inspection of the DHR records and subsequent release of information it found to be material to Marshall’s defense is in keeping with the intent of the legislature.
In Russell v. State, 533 So.2d 725 (Ala.Crim.App.1988), the defendant, who was the boyfriend of the victim’s mother, was convicted of first-degree rape and first-degree sexual abuse. On appeal, Russell argued that he was entitled to inspect the entire DHR file concerning the victim. This Court rejected Russell’s argument that he was entitled to the entire DHR file. In so doing, this Court relied on the United States Supreme Court’s decision in Pennsylvania v. Ritchie, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987):
‘“The opinions of this Court show that the right of confrontation is a trial right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination. See California v. Green, 399 U.S. 149, 157, 90 S.Ct. 1930, 1934, 26 L.Ed.2d 489 (1970) (“[I]t is this literal right to ‘confront’ the witness at the time of trial that forms the core of the values furthered by the Confrontation Clause”); Barber v. Page, 390 U.S. 719, 725, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255 (1968) (“The right to confrontation is basically a trial right”). The ability to question adverse witnesses, however, does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony. Normally the right to confront one’s accusers is satisfied if defense counsel receives wide *202 latitude at trial to question witnesses. Delaware v. Fensterer, supra, 474 U.S. [15], at 22, 106 S.Ct. [292], at 296 [88 L.Ed.2d 15 (1985)]. In short, the Confrontation Clause only guarantees “an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.” Id., at [20], 106 S.Ct., at 295 (emphasis in original). See also Ohio v. Roberts, supra, 448 U.S. [56], at 73, n. 12, 100 S.Ct. [2531], at 2543, n. 12 [65 L.Ed.2d 597 (1980)] (except in “extraordinary cases, no inquiry into ‘effectiveness’ [of cross-examination] is required”).’
“Ritchie, 107 S.Ct. at 999 (emphasis and brackets in original) (footnote omitted).
[[Image here]]
“Like Alabama’s § 26-14-8, the Pennsylvania statute did not grant absolute confidentiality but provided for disclosure in certain circumstances. Therefore, Ritchie was entitled to the disclosure of information material to his defense.
“ ‘In the absence of any apparent state policy to the contrary, we therefore have no reason to believe that relevant information would not be disclosed when a court of competent jurisdiction determines that the information is “material” to the defense of the accused.
[[Image here]]
“ ‘... Ritchie is entitled to have the CYS file reviewed by the trial court to determine whether it contains information that probably would have changed the outcome of his trial.’ Ritchie, 107 S.Ct. at 1002.
“Additionally, the Supreme Court held that Ritchie had no right to full disclosure or inspection of the confidential files and records of the child abuse agency.
“ ‘A defendant’s right to discover exculpatory evidence does not include the unsupervised authority to search through the Commonwealth’s files. See United States v. Bagley, 473 U.S. [667] at 675, 105 S.Ct. [3375] at [3379, (1985)]; United States v. Agurs, supra, 427 U.S. [97], at 111, 96 S.Ct. [2392], at 2401 [(1976)]. Although the eye of an advocate may be helpful to a defendant in ferreting out information, Dennis v. United States, 384 U.S. 855, 875, 86 S.Ct. 1840, 1851, 16 L.Ed.2d 973 (1966), this Court has never held — even in the absence of a statute restricting disclosure — that a defendant alone may make the determination as to the materiality of the information. Settled practice is to the contrary. In the typical case where a defendant makes only a general request for exculpatory material under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194[, 10 L.Ed.2d 215 (1963)], it is the State that decides which information must be disclosed. Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court’s attention, the prosecutor’s decision on disclosure is final. Defense counsel has no constitutional right to conduct his own search of the State’s files to argue relevance. See Weatherford v. Bursey, 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977) (“There is no general constitutional right to discovery in a criminal case, and Brady did not create one”).
“ ‘We find that Ritchie’s interest (as well as that of the Commonwealth) in ensuring a fair trial can be protected fully by requiring that the CYS files *203 be submitted only to the trial court for in camera review....
[[Image here]]
“ ‘... The Commonwealth’s purpose [in protecting its child abuse information and in uncovering and treating child abuse] would be frustrated if this confidential material had to be disclosed upon demand to a defendant charged with criminal child abuse, simply because a trial court may not recognize exculpatory evidence. Neither precedent nor common sense requires such a result.’ Ritchie, 107 S.Ct. at 1003-04 (footnote omitted).”
533 So.2d at 726-28.
Like the defendants in Ritchie and Russell, Marshall was entitled only to an in camera inspection of the DHR files so that the circuit court could determine whether any of the documents were material to the defense. Marshall was not entitled to his own inspection of the DHR files pertaining to Marshall’s child, which, he says, would have established a motive for the victim to lie about Marshall’s involvement in the offense. Following the in camera inspection by the circuit court, Marshall received evidence the court deemed material to Marshall’s theory of the ease i.e., that DHR went to Virginia and Cook’s house between February 15, 2006, and February 24, 2006. Marshall was then allowed to recall Cook to the witness stand and question him about DHR’s visiting his house between February 15, 2006, and February 24, 2006. Additionally, Marshall was allowed to cross-examine Virginia about DHR’s coming to the house, and Marshall, himself, also testified regarding the allegations he made about Cook to DHR. Although Marshall correctly recognizes that he was not given an opportunity to cross-examine the witnesses to the extent that he might wish, he was afforded an opportunity for effective cross-examination, which is all that is constitutionally required. Accordingly, the circuit court did not abuse its discretion when it did not disclose the DHR records to Marshall and only provided him with information it deemed material to Marshall’s defense.
Based on the foregoing reasons, the judgment of the circuit court is affirmed.
AFFIRMED.
WELCH, P.J., and WINDOM, KELLUM, and BURKE, JJ., concur.

. Marshall’s sentences were enhanced pursuant to the deadly-weapon enhancement in §§ 13A-5-6(4) and-6(5), Ala.Code 1975.